Argued and submitted March 1, decision of Court of Appeals and judgment of
circuit court affirmed August 15, 2002

STATE OF OREGON,
*Respondent on Review,*

*v.*

LOREN MACNAB,
*Petitioner on Review.*

(CC CM9721537; CA A103792; SC S48039)

51 P3d 1249

Andy Simrin, Deputy Public Defender, Salem, argued the cause and filed the briefs for petitioner on review. With him on the briefs was David E. Groom, State Public Defender.

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause and filed the response for respondent on review. With him on the response were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Gail L. Meyer, of Lerner and Meyer, Portland, filed a brief on behalf of *amicus curiae* SOHOPEFUL and John Does Nos. 6, 9, & 10.

DE MUNIZ, J.

## DE MUNIZ, J.

The issue presented in this criminal case is whether the *ex post facto* clauses of the Oregon or the United States constitutions prohibit defendant's criminal conviction for failure to register as a sex offender.[1] ORS 181.599 (1995).[2]

In 1990, defendant was convicted of sexual abuse in the first degree for an act of sexual misconduct that he committed in 1987. The court sentenced defendant to five years in prison. Defendant was released on parole in 1991. From 1991 to 1994, defendant's parole officer annually registered defendant as a sex offender, as required by *former* ORS 181.518 (1989), *renumbered as* ORS 181.595 (1995). Defendant's sentence expired in 1994. In November 1995, the Oregon State Police (OSP) notified defendant by letter that he had an obligation to register annually as a sex offender. In February 1996, defendant responded to OSP indicating that he had received their letter. In September 1997, the state charged defendant with failing to register as a sex offender in violation of ORS 181.599 (1995).[3]

---

[1] Article I, section 21, of the Oregon Constitution, provides, in part: "No *ex-post facto* law * * * shall ever be passed * * *." Article I, section 10, of the United States Constitution, provides, in part: "No state shall * * * pass any * * * ex post facto Law[.]"

[2] ORS 181.599 (1995) provided, in part:

"(1)  A person who has knowledge of the registration requirement and who fails to make the initial registration or to register following a change of address as required by ORS 181.595 and 181.596 * * * commits a:

"(a)  Class C felony, if the crime for which the person is required to register is a felony[.]"

ORS 181.596(3) (1995) provided:

"Following discharge, release from active parole or other supervised or conditional release, the person [,a convicted sex offender,] shall provide, in writing, the address of the person to the Oregon State Police:

"(a)  Within 30 days of a change of residence; and

"(b)  Once each year regardless of whether the person changed address."

[3] The indictment charging defendant provided:

"The defendant, on or about 3/6/96, in the County of Benton and State of Oregon, being a person required by law to register with the Oregon State Police as a sex offender and having knowledge of the registration required, did unlawfully, feloniously and knowingly fail to register."

Before his trial in 1998, defendant filed a "Demurrer to Indictment and Alternative Motion to Dismiss" arguing that "ORS 181.594 *et seq.* and ORS 181.599 are unconstitutional in that they violate the *ex post facto* clauses of the Constitution of the United States and of the State of Oregon." The trial court overruled defendant's demurrer. Defendant was convicted for failing to register as a sex offender and was sentenced to 60 days' incarceration.

Defendant appealed to the Court of Appeals, arguing that, because Oregon did not have a sex offender registration law when he committed sexual abuse in 1987, requiring him to register as a sex offender under the 1995 law is an unconstitutional *ex post facto* application of law. The Court of Appeals rejected defendant's argument and affirmed his conviction. *State v. MacNab*, 170 Or App 538, 13 P3d 167 (2000). We allowed defendant's petition for review and now affirm the decision of the Court of Appeals.

Before this court, defendant asserts that, "[b]y imposing lifetime reporting requirements, subject to imprisonment for noncompliance, the legislature retroactively altered, to [defendant's] disadvantage, the situation of persons previously convicted of sex offenses." Defendant contends that subjecting him to retroactive application of the 1995 sex offender registration law violates the *ex post facto* clauses of the Oregon and United States constitutions in that it "increases [his] punishment by extending [his] sentence."[4] The state offers alternative arguments in response.

As a preliminary matter, we address the state's assertion that there is no *ex post facto* issue in this case "because 'the law' was not applied retroactively." In other words, the state contends that the conduct for which the trial court convicted defendant is "failing to register," and that it is undisputed that that criminal conduct occurred after the legislature enacted the registration law at issue. We reject that contention because it misstates the legal challenge that defendant has framed. As noted above, defendant contends

---

[4] Defendant concedes that, as a matter of statutory construction, the legislature intended the 1995 sex offender registration law to apply to offenders convicted before the passage of the law. We agree that the legislature intended that application of the law.

that requiring him to register as a sex offender imposes a punishment that was not part of Oregon law in 1987, the year he committed his act of sexual misconduct.

As to the issue that defendant has framed, the state contends that the sex offender registration requirement is a regulatory law that does not increase defendant's punishment in violation of either *ex post facto* provision. To identify the parameters of the constitutional issue that we resolve in this case, we briefly summarize the history of Oregon's sex offender registration laws.

Before 1989, Oregon did not have a sex offender registration law.[5] However, in 1989, the legislature enacted *former* ORS 181.518 (1989), which required convicted sex offenders to register with OSP for a period of five years. That statute also required an offender, during that five-year period, to report any change of address within 30 days. There was no penalty for noncompliance. The legislature added penalties for noncompliance in 1991 when it passed Oregon Laws 1991, chapter 389, section 4, making it a felony to fail to report a change of address if the offender's underlying crime was a felony. The law classified an offender's failure to file an annual report as a violation. *Id.*

In 1993, the legislature enacted *former* ORS 181.507 (1993), *renumbered as* ORS 181.585 (1995), which allowed supervising agencies to classify certain offenders as "predatory" sex offenders. That classification permitted the supervising agency, pursuant to *former* ORS 181.508 (1993), *renumbered as* ORS 181.586 (1995), to notify "anyone whom the agency determines is appropriate that the person is a predatory sex offender."

In 1995, the legislature enacted a more comprehensive sex offender registration law. ORS 181.596(3) (1995) required that convicted sex offenders register annually, in writing, with OSP and to notify OPS, in writing, within 30 days of a change of address. ORS 181.599 (1995) made it a felony for a felony sex offender, with knowledge of the registration requirements, to fail to register. At the same time, ORS

---

[5] By 1996, all 50 states had adopted a sex offender registration statute. *See People v. Ross*, 646 NYS2d 249, 250 n 1 (1996) (listing states).

181.588 (1995) prohibited public dissemination of the lists of registered offenders, or their addresses, unless a law enforcement agency declared that an offender was a "predatory" sex offender. If the law enforcement agency made that determination, then it also could notify anyone that it determined appropriate to receive notification. ORS 181.588(1) (1995).[6]

Because defendant was convicted in 1998 for violating the 1995 sex offender registration law, and because there is no evidence in this record that OSP has designated defendant a "predatory" sex offender, the 1995 sex offender registration law is the only one at issue in this case.[7]

Defendant raises both state and federal *ex post facto* challenges to the 1995 registration requirements. Although this court in the past has "construe[d] these particular state and federal provisions without distinguishing them," *State v. Wille*, 317 Or 487, 502, 858 P2d 128 (1993), this court's constitutional methodology requires that we first consider defendant's argument under Article I, section 21, of the Oregon Constitution. *See State v. Fugate*, 332 Or 195, 210, 26 P3d 802 (2001) (citing *State v. Cookman*, 324 Or 19, 25, 920 P2d 1086 (1996), for *ex post facto* analytical paradigm). Doing so is particularly appropriate now because, in *Cookman*, and later in *Fugate*, this court did not defer to the federal *ex post facto* analysis, but instead relied on the formulation established in *Priest v. Pearce*, 314 Or 411, 840 P2d 65 (1992), to ascertain the meaning of Article I, section 21.[8]

---

[6] Currently, ORS 181.592(4)(a) and (b) (2001) provide authority for the Department of State Police to make certain sex offender registration information available to the public. In 1999, the state police promulgated OAR 257-070-0030 (1999), which established the "Sex Offender Web Site." However, that rule was certified with the Secretary of State on September 13, 1999, to be a temporary rule effective only through March 10, 2000. Our research suggests that since March 10, 2000, OSP has not adopted another administrative rule that outlines procedures for implementing public notification of sexual offenders over the Internet.

[7] On review, defendant also argues that retroactive application of Senate Bill 740 (1999), which authorized OSP to adopt rules concerning sex offender registration and electronic community notification, violates the *ex post facto* clauses of the federal and state constitutions. We decline to address defendant's arguments regarding Senate Bill 740 because there is no evidence in this record that OSP has placed defendant on a "Sex Offender Web Site," or that OSP has applied any aspect of that law to him.

[8] In *Cookman*, this court noted that "its past reliance on the [U.S.] Supreme Court's pronouncements when construing Oregon's law do not imply that the meaning of Oregon's law is forever fixed to the federal courts' understanding of analogous federal law." 324 Or at 27 n 7.

In *Fugate*, this court analyzed the meaning of Article I, section 21, by examining its text, the case law interpreting it, and the historical circumstances surrounding its creation. 332 Or at 210. The *Fugate* court concluded that, like the framers of the United States Constitution, the framers of the Oregon Constitution intended for Article I, section 21, to proscribe four categories of penal laws: those that punish acts that were legal before enactment; those that aggravate a crime to a level greater than it was before enactment; those that impose greater or additional punishment than that annexed to the crime before enactment; and those that deprive a defendant of a defense that was available before enactment.[9] *See Fugate*, 332 Or at 214 (concluding that four categories of laws identified in *Calder v. Bull*, 3 US (3 Dall) 386, 1 L Ed 648 (1798), are *ex post facto* laws that Article I, section 21, prohibits).

■ Defendant argues that the 1995 sex offender registration law falls into the third category of *ex post facto* laws because requiring him to register as a sex offender increases his punishment beyond that annexed to his 1987 sexual abuse crime. Thus the issue is whether the 1995 sex offender registration law imposes a form of increased punishment that Article I, section 21, prohibits. *See State v. Rogers*, 330 Or 282, 297, 4 P3d 1261 (2000) (court should "apply faithfully the principles embodied in the Oregon Constitution to modern circumstances as those circumstances arise").

We begin with the text of Article I, section 21, and observe that all that can be gleaned from the text is that it

---

[9] Defendant urges this court, instead of relying exclusively on the four *Calder v. Bull*, 3 US (3 Dall) 386, 1 L Ed 548 (1798), categories, to rely on the factors listed in *Strong v. The State*, 1 Blackf 193, 196 (1822), a case that interpreted the *ex post facto* clause of the 1816 Indiana Constitution. Defendant argues that a law that "increase[s] the malignity of a crime" is a separate category apart from the four listed in *Calder*, and should be construed to conflict with Article I, section 21.

We decline to adopt that reasoning because we conclude that, in 1822, the *Strong* court merely interpreted the 1798 *Calder* categories. The fact that the *Calder* court listed four categories and that the *Strong* court similarly paraphrased, in identical order, those four categories, leads us to conclude that the *Strong* court did not intend to expand the scope of the four *Calder* categories, but merely intended to clarify them. For that reason, we decline to expand *Strong* beyond the scope of *Calder*, as defendant requests, and thus conclude that "increasing the malignity" of a crime merely modifies and explains the third *Calder* category, but adds nothing to its breadth.

forbids the passage of laws "after the fact." *Cookman*, 324 Or at 26. The word "punishment" is not a part of the text of Article I, section 21. However, in *Fugate* this court interpreted Article I, section 21, to forbid laws that inflict "punishment" not annexed to the crime at the time of commission. *See Fugate*, 332 Or 211-13 (discussing four *Calder* categories).

Although the text of Article I, section 21, does not reveal the conceptual contours of "punishment," the framers had available to them a mid-nineteenth century law dictionary that contained the following comprehensive definition of punishment:

> "some pain or penalty warranted by law, inflicted on a person, for the commission of a crime or misdemeanor, by the judgment and command of some lawful court. Punishments are either corporal or not corporal. * * *. The punishments which are non corporal, are fines; forfeitures; suspension or deprivation of some political or civil right; deprivation of office, and being rendered incapable to hold office; compulsion to remove nuisances. The object of punishment is to reform the offender; to deter him and others from committing like offences; and to protect society."

John Bouvier, II, *A Law Dictionary Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union*, 311 (1839) (citing Vide 4 Bl Com 7; Rutherf Inst B 1, ch 18). *See Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 92, 23 P3d 333 (2001) (referring to same dictionary to determine meaning of word "remedy," as intended by framers of Article I, section 10, of Oregon Constitution).

Thus, by the mid-nineteenth century, noncorporal sanctions such as fines, forfeitures and suspensions or deprivations of some political or civil rights, were included within the accepted legal dictionary definition of "punishment." Notably, each form of noncorporal sanction within that definition imposes on the offender some detriment, restraint, or deprivation that is intended to deter the offender and others from committing future offenses.

We turn next to this court's case law. Neither party refers the court to a case that makes clear the parameters of punishment that Article I, section 21, prohibits. Defendant

asserts, however, that this court's opinion in *Brown v. Multnomah County Dist. Ct.*, 280 Or 95, 570 P2d 52 (1977), provides some guidance in defining prohibited punishment under Article I, section 21.

*Brown* required the court to determine whether a first offense driving under the influence proceeding for which no imprisonment was authorized was, nevertheless, a "criminal prosecution" that triggered a defendant's constitutional right to appointed counsel, jury trial, and proof beyond a reasonable doubt. The *Brown* court identified a number of "indicia" that it considered relevant in determining whether an ostensibly civil proceeding nevertheless retained "punitive traits that characterize a criminal prosecution." 280 Or at 110.

One of the indicia that *Brown* described as importing "punitive significance" provides some general guidance about the principles that underlie the concept of punishment. In that regard, the *Brown* court commented that the purpose of criminal law customarily is stated to be " 'retribution and deterrence,' * * * meaning deterrence both of the individual defendant and of persons in his situation generally." 280 Or at 105. Nevertheless, the court noted that, because "deterrence is equally a purpose of other sanctions," identifying the deterrent effect of a law does not necessarily establish that a law is "punitive." *Id.* Finally, the *Brown* court acknowledged that at least one leading scholar had concluded that the "stigma of [community] condemnation" is the overriding principle that tends to separate criminal from civil sanctions. *Id.* at 106 (citing Hart, *The Aims of the Criminal Law*, 23 Law & Contemp Prob 401, 404 (1958)). Informed by *Brown*'s "punitive significance" discussion, we turn to the historical circumstances that led to the creation of Article I, section 21.

Article I, section 21, was derived from Article I, section 24, of the 1851 Indiana Constitution.[10] *See Cookman*, 324 Or at 28 (so stating). The 1816 Indiana Constitution contained an almost identical *ex post facto* provision.[11] In 1833,

---

[10] Article I, section 24, of the Indiana Constitution of 1851, provided: "No *ex post facto* law * * * shall ever be passed."

[11] Article I, section 18, of the Indiana Constitution of 1816, provided: "No *ex post facto* law * * * shall ever be made."

the Indiana Supreme Court construed that 1816 provision. In doing so, that court noted its similarity to the federal *ex post facto* clause, and embraced Blackstone's definition of an *ex post facto* law:

> "The first thing then to be determined is, whether [the law in question] is an *ex post facto* law? Blackstone defines an *ex post facto* law to be a law made after the commission of an indifferent act, declaring the act to be a crime, and inflicting a punishment upon the person who committed it."

*Martindale v. Moore*, 3 Blackf 275, 276 (1833).

Blackstone's definition of an *ex post facto* law also was deemed to be "precisely in the same light" as the meaning Justice Chase ascribed to the federal *ex post facto* clause in *Calder*. *See Cookman*, 324 Or at 30 (citing *Calder* reference to Blackstone).

Neither *Martindale* nor *Calder* defined "punishment" for purposes of the *ex post facto* prohibition. However, both cases referred to Blackstone to discern the meaning of the *ex post facto* clauses. Blackstone was also available to the framers of the Oregon Constitution when they adopted the Indiana *ex post facto* clause as Article I, section 21, of the Oregon Constitution. Blackstone's chapter 29 entitled "OF JUDGMENT, AND IT'S CONSEQUENCES" includes a detailed discussion of the common forms of punishment for the violation of criminal laws. Blackstone described those as follows:

> "Some punishments consist in exile or banishment, by abjuration of the realm, or transportation to the American colonies: others in loss of liberty, by perpetual or temporary imprisonment. Some extend to confiscation, by forfeiture of lands, or moveables, or both, or of the profits of lands for life: others induce a disability, of holding offices or employments, being heirs, executors, and the like. Some, though rarely, occasion a mutilation or dismembering, by cutting off the hand or ears: others fix a lasting stigma on the offender, by slitting the nostrils, or branding in the hand or face. Some are merely pecuniary, by stated or discretionary fines: and lastly there are others, that consist principally in their ignominy, though most of them are mixed with some degree of corporal pain; and these are inflicted chiefly for

crimes, which arise from indigence, or which render even. opulence disgraceful."

William Blackstone, 4 *Commentaries on the Laws of England* *370 (1769).

As noted, both Bouvier and Blackstone were available to the framers of the Oregon Constitution. The similarity of the attributes of punishment that they identify, and the respect accorded Blackstone in mid-nineteenth century jurisprudence persuade us that even the most expansive mid-nineteenth century understanding of noncorporal punishment included some form of detriment, restraint, or deprivation intended primarily to deter the offender and others from committing future criminal acts.[12] We conclude that the framers understood punishment to encompass those attributes at the time that they considered Article I, section 21. Accordingly, we examine the 1995 sex offender registration law to determine whether those punitive attributes (detriment, restraint, or deprivation intended to deter the offender and others) are present to such a degree that the application of the law to defendant violates Article I, section 21, of the Oregon Constitution.

When the legislature passed the sex offender registration law in 1991, it declared expressly that "[t]he purpose of ORS 181.517, ORS 181.518 and ORS 181.519 and sections

---

[12] Defendant asserts that in the mid-nineteenth century the United States Supreme Court expansively construed the federal *ex post facto* clause to forbid any law that "alters the situation of a party to his disadvantage." *See United States v. Hall*, 26 F Cas 84, 86 (CC Pa 1809) (No 15,285), *aff'd* 10 US (6 Cranch) 171, 176 L Ed 189 (1910). Justice Washington made those comments about *ex post facto* laws as a circuit rider in a Pennsylvania case. Nevertheless, defendant argues that Justice Washington's view of the reach of the *ex post facto* prohibition was approved in *Kring v. Missouri*, 107 US (17 Otto) 221, 25 S Ct 443, 27 L Ed 506 (1883). According to defendant, though that interpretation of the federal *ex post facto* clause was overruled in *Collins v. Youngblood*, 497 US 37, 50, 110 S Ct 2715, 111 L Ed 2d 30 (1990), Justice Washington's interpretation was in effect when the Oregon Constitution was adopted and should be considered by the court as part of the historical circumstances surrounding the adoption of Article I, section 21.

We have serious doubts whether the framers of the Oregon Constitution embraced Justice Washington's expansive view of the *ex post facto* prohibition. However, we need not decide that point, because, as we hold *post*, the sex offender registration law at issue here does not "alter the situation of a party to his disadvantage" to the degree necessary to violate the *ex post facto* clause of either the state or federal constitution.

4 to 6 [making failure to register a crime] of this Act is to assist law enforcement agencies in preventing future sex offenses." Or Laws 1991, ch 389, § 7. The operation of the law conforms to the legislature's declared purpose.

As a practical matter, the 1995 registration law does little more than obtain information to update the already existing Law Enforcement Data Systems (LEDS) entry describing an offender and the offender's criminal history.[13] The time and physical demands of complying with the annual registration and change of address reporting requirements in the 1995 law are so minimal that they cannot be considered the imposition of a detriment, restraint, or deprivation on the offender.[14] Because under the 1995 law at issue here, the public dissemination of registry information is limited to the offender's victim, there can be no credible claim of public humiliation over and above that already engendered by a public trial and permanent criminal record.

The 1995 registration requirement does not subject an offender to undue restraint in the form of comprehensive or intrusive police scrutiny, control, or monitoring. The offender remains free to come and go as he or she pleases. To the extent that the police may regard registered sex offenders as possible suspects in the investigation of sex crimes, ultimately that is a function of the offender's criminal history. Similarly, to the extent that an offender is deterred by the registration requirement from committing future crimes, the deterrent effect is a secondary or ancillary one, similar to the deterrent effect associated with civil sanctions such as driver license suspensions, and Oregon State Bar suspensions and disbarments. *See, e.g., In re Harris*, 334 Or 353, 49 P3d 778 (2002) (lawyer disciplinary proceeding not punishment); *Burbage v. Dept. of Motor Vehicles*, 252 Or 486, 491, 450 P2d 775 (1969) (suspension proceeding nonpunitive); *State v. Robinson*, 235 Or 524, 532, 385 P2d 754 (1963) (driver license

---

[13] LEDS is an electronic system of storage, retrieval, and dissemination of information about offenders. *See* ORS 181.730; OAR 257-015-0000 to OAR 257-015-0100 (all describing system).

[14] The registration and reporting requirements are similar to Oregon's driver license requirements. An Oregon driver license must be renewed every eight years, ORS 807.130, and any change of address must be reported by the license holder to the Department of Transportation within 30 days of the change, ORS 807.560.

revocation proceeding not punishment nor intended to be punishment); *Ex parte Finn*, 32 Or 519, 531, 52 P 756 (1898) (disbarment proceeding not punishment).

Based on the foregoing, we conclude that requiring defendant to register as a sex offender does not impose any significant detriment, restraint, or deprivation on defendant and, therefore, is not a form of increased "punishment" prohibited by Article I, section 21, of the Oregon Constitution. We now turn to the federal *ex post facto* clause.

■ With regard to the federal clause, the United States Supreme Court has developed a two-part "intent-effects" test that it uses to determine whether legislation applied retroactively violates the federal *ex post facto* clause. *See Kansas v. Hendricks*, 521 US 346, 117 S Ct 2072, 138 L Ed 2d 501 (1997) (applying intent-effects test to determine whether application of Kansas Sexually Violent Predatory Act violated federal *ex post facto* clause).[15]

Under the two-part test, the first inquiry is whether the legislature intended the law in question to be punitive or regulatory. That inquiry focuses on the declared purpose of the legislature. *See generally United States v. Ward*, 448 US 242, 249, 100 S Ct 2636, 65 L Ed 2d 742 (1980) (providing example).

As noted earlier, in 1991, the legislature declared expressly that "[t]he purpose of ORS 181.517, ORS 181.518 and ORS 181.519 and sections 4 to 6 of this Act [making failure to register a crime] is to assist law enforcement agencies in preventing future sex offenses." Or Laws 1991, ch 389, § 7. Requiring offenders to apprise law enforcement officials of basic identifying information, including the offender's whereabouts, is consistent with the legislature's declared purpose.

---

[15] The intent-effects test has been applied by courts throughout the country to determine whether state sex offender registration and notification laws violate either the state or the federal *ex post facto* clause. *See Dean v. State*, 60 SW3d 217, 220-21 (Tex App-Houston [14th Dist] 2001) (citing cases from various state and federal circuits).

We need look no further than the legislature's recital and the structure of the statutes to conclude that the purpose of the registration requirement is regulatory. However, the legislature's declared regulatory purpose does not establish conclusively that the law is not otherwise punitive in effect and, therefore, violative of the federal *ex post facto* clause.

The second part of the analysis requires a determination of whether the registration law is nevertheless so punitive in effect that it negates the legislature's regulatory intent. *Ward*, 448 US at 249. With regard to the second inquiry, the Supreme Court has cautioned that when the legislature's declared purpose is regulatory, the party challenging the law must provide the "clearest proof" that the effect of the law is otherwise. *See Ward*, 448 US at 248-49 (so stating).

The Supreme Court has identified a number of factors that may be relevant in determining whether the effect of a law is punitive. *See Kennedy v. Mendoza-Martinez*, 372 US 144, 168-69, 83 S Ct 554, 9 L Ed 2d 644 (1963) (identifying factors).[16] In doing so, the Court has pointed out that the identified factors are "certainly neither exhaustive nor dispositive." *Ward*, 448 US at 249.

We have considered the factors identified in *Kennedy* as they relate to the 1995 sex offender registration law. For the reasons expressed in our analysis under Article I, section 21, of the Oregon Constitution, we conclude that there is not "the clearest proof" that the sex offender registration scheme is punitive in either its purpose or effect. It follows that requiring defendant to register as a sex

---

[16] As applicable here, the factors identified by the Supreme Court can be formulated as follows: (1) whether the registration requirement involves an affirmative disability or restraint; (2) whether the registration requirement historically has been regarded as a punishment; (3) whether the registration requirement comes into play only on a finding of scienter; (4) whether the registration requirement promotes the traditional aims of punishment retribution and deterrence; (5) whether the behavior to which the registration requirement applies is already a crime; (6) whether there is some purpose other than punishment that rationally can be assigned to the registration requirement; and (7) whether the registration requirement appears excessive in relation to the alternative purpose assigned to it by the legislature.

offender does not impose increased punishment not annexed to defendant's 1987 sex crime and, therefore, does not violate the *ex post facto* clause of the United States Constitution.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.