Submitted on record and briefs October 31, 2006, affirmed February 21, 2007

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## AGUSTIN VAZQUEZ-ESCOBAR,
*Defendant-Appellant.*

Multnomah County Circuit Court
031155488; A126694

153 P3d 168

Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, Legal Services Division, and Stephanie Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Paul L. Smith, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Defendant appeals, challenging the permanent revocation of his driving privileges after he pleaded guilty to driving under the influence of intoxicants (DUII). ORS 813.010. The trial court revoked defendant's driving privileges pursuant to ORS 809.235(1)(b), which requires a court to do so when a defendant has been convicted of DUII for a third time. Defendant asserts that the revocation violated the *ex post facto* provisions of the Oregon and United States constitutions, Or Const, Art I, § 21; US Const, Art I, § 10, because the conduct giving rise to his third DUII conviction occurred before the effective date of ORS 809.235(1)(b). We review for legal error and affirm.

ORS 809.235(1)(b) (2003), *amended by* Or Laws 2005, ch 436, § 1, provides:

> "The court shall order that a person's driving privileges be permanently revoked * * * if the person is convicted of misdemeanor driving while under the influence of intoxicants under ORS 813.010 for a third time."

That permanent revocation provision became effective on January 1, 2004, Or Laws 2003, ch 346, and applies "to persons whose third *conviction* of misdemeanor driving while under the influence of intoxicants occurs on or after the effective date of [the] Act." Or Laws 2003, ch 346, § 4 (emphasis added).[1] Before January 1, 2004, a person, upon a third misdemeanor DUII conviction, was subject, at most, to a three-year suspension of driving privileges. ORS 813.400(1) (2001), *amended by* Or Laws 2003, ch 346, § 1; *former* ORS 809.420(2)(c) (2001), *renumbered as* ORS 809.428 (2003).

Defendant was convicted of DUII in 1996 and 1997. On April 19, 2003, defendant was arrested for, and charged

---

[1] ORS 809.235(1)(b) was amended in 2005 in two respects, Or Laws 2005, ch 436, § 1, neither of which is relevant to this appeal. In its current version, the statute reads, in part, as follows:

> "The court shall order that a person's driving privileges be permanently revoked * * * if the person is convicted of misdemeanor driving while under the influence of intoxicants in violation of ORS 813.010 *or its statutory counterpart in any other jurisdiction* for a third *or subsequent* time."

(Emphasis added.)

with, DUII a third time. On April 21, 2004—a year later—defendant pleaded guilty and was convicted of DUII based on the April 19, 2003, incident. In the interim, ORS 809.235(1)(b) (2003) became effective.

The state sought permanent revocation of defendant's driving privileges based on the intervening amendment because defendant's third DUII *conviction* occurred after the effective date of the amendment. Defendant responded that, because ORS 809.235(1)(b) (2003) had not been in effect at the time that he *committed* his third DUII offense, revocation pursuant to that statute would violate the *ex post facto* provisions of the Oregon and United States constitutions.

The trial court concluded that permanent revocation of defendant's driving privileges did not constitute "punishment" for state and federal *ex post facto* purposes and, consequently, rejected defendant's constitutional arguments. The court permanently revoked defendant's driving privileges and made that revocation a condition of his sentence of probation.

■ On appeal, defendant reiterates his constitutional arguments. Under the "first things first" doctrine, we begin with defendant's challenge under Article I, section 21, of the Oregon Constitution. *See, e.g., MacPherson v. DAS*, 340 Or 117, 125-26, 130 P3d 308 (2006) (Oregon courts analyze state constitutional challenges before turning to federal constitutional challenges).

■ Article I, section 21, of the Oregon Constitution provides that "[n]o *ex-post facto* law * * * shall ever be passed[.]" As the Supreme Court explained in *State v. MacNab*, 334 Or 469, 475, 51 P3d 1249 (2002):

> "[T]he framers of the Oregon Constitution intended for Article I, section 21, to proscribe four categories of penal laws: those that punish acts that were legal before enactment; those that aggravate a crime to a level greater than it was before enactment; those that impose greater or additional punishment than that annexed to the crime before enactment; and those that deprive a defendant of a defense that was available before enactment."

Here, defendant argues that his license revocation under ORS 809.235(1)(b) (2003) falls into the third, "greater or additional punishment," category. The issue in a challenge under that category is whether the challenged law "imposes a form of increased *punishment* that Article I, section 21, prohibits." *MacNab*, 334 Or at 475 (emphasis added).

In *MacNab*, the court addressed, and rejected, an *ex post facto* challenge to a sex offender registration statute. The court began by explaining that, although the word "punishment" is not a part of the text of Article I, section 21, the focus of that section is to prohibit " 'punishment' not annexed to the crime at the time of commission." 334 Or at 476. The court then framed the dispositive inquiry:

> "[E]ven the most expansive mid-nineteenth century understanding of noncorporal *punishment included some form of detriment, restraint, or deprivation intended primarily to deter the offender and others from committing future criminal acts*. We conclude that the framers understood punishment to encompass those attributes at the time that they considered Article I, section 21. Accordingly, we examine the 1995 sex offender registration law to determine whether those punitive attributes (detriment, restraint, or deprivation intended to deter the offender and others) are present to such a degree that the application of the law to defendant violates Article I, section 21, of the Oregon Constitution."

*Id.* at 479 (footnote omitted; emphasis added).

Applying that formulation, the court observed that the registration statute's express purpose was to preclude future sex offenses and that, "[a]s a practical matter," the statute's operation "conforms to the legislature's declared purpose." *Id.* at 480. Accordingly, the court concluded that the registration requirement "does not impose any significant detriment, restraint, or deprivation" on defendants constituting increased "punishment" for purposes of Article I, section 21. *Id.* at 481.

Consistently with *MacNab*'s formulation of "punishment," we begin, as did the court in *MacNab*, with the legislative purpose in enacting ORS 809.235(1)(b) (2003). That is,

was the imposition of permanent revocation *"intended* primarily to deter the offender and others from committing future criminal acts"? *MacNab,* 334 Or at 479 (emphasis added); *see also Butler v. Board of Parole,* 194 Or App 164, 169, 94 P3d 149, *rev den,* 337 Or 555 (2004) ("Under [*MacNab*'s] definition [of punishment], it is insufficient merely to show that a legislative or regulatory change has imposed a detriment, restraint, or deprivation on an offender. It also is necessary to show that the action is intended to serve as a deterrent to crime.").

The text of ORS 809.235(1)(b) (2003) itself does not include any statement of legislative purpose. However, ORS 801.020(11), which states the general purposes of the Oregon Vehicle Code, including ORS 809.235, provides:

"It is hereby declared to be the policy of this state:

"(a) To provide maximum safety for all persons who travel or otherwise use the public highways of this state;

"(b) To deny the privilege of operating motor vehicles on the public highways to persons who by their conduct and record have demonstrated their indifference for the safety and welfare of others and their disrespect for the laws of the state, the orders of its courts and the statutorily required acts of its administrative agencies; and

"(c) To discourage repetition of criminal acts by individuals against the peace and dignity of the state and its political subdivisions and to impose increased and added deprivation of the privilege to operate motor vehicles upon habitual offenders who have been convicted repeatedly of violations of traffic laws."

In *State v. Phillips,* 138 Or App 468, 909 P2d 882, *rev den,* 323 Or 114 (1996), we analyzed those purposes in an analogous context. In *Phillips,* we addressed whether a one-year suspension of privileges pursuant to ORS 813.100 (the implied consent law) was "punishment" for federal double jeopardy purposes. As part of our constitutional analysis, we had to determine whether "deterrence alone [was] the goal" of the suspension, or if, instead, there was "any remedial goal." 138 Or App at 473-74. We observed that the general purposes of the Oregon Vehicle Code, as declared in ORS 801.020(11), are "unquestionably remedial in nature." *Id.* at

474. With respect to the purposes of ORS 813.100 specifically, we concluded:

> "In order to carry out the purposes of the code, the legislature has enacted a comprehensive program of licensing and license suspension and revocation. The legislature has also determined that a person with a blood alcohol content of .08 or greater who drives a vehicle poses a danger to the public welfare and has prohibited that conduct. ORS 813.010[1](a). *Suspending the driving privileges of drivers who drive while intoxicated is a method of removing the danger posed by intoxicated drivers. Even accepting defendant's argument that the threat of administrative suspension of a driver's license may serve to deter drivers from driving under the influence or refusing the breath test, that deterrent consequence does not alter the remedial nature of the statutory scheme.*"

*Id.* (emphasis added).

Here, defendant notes correctly that, in *Phillips*, we were addressing a double jeopardy challenge, not an *ex post facto* challenge. Thus, we were required only to find "*any* remedial" purpose—and not a *primarily* remedial (as opposed to deterrent) purpose—in determining that the suspension of driving privileges was not "punishment" for double jeopardy purposes. Defendant further notes, again correctly, that, in *Phillips*, we referred only to paragraphs (a) and (b) of the statement of policy in ORS 801.020(11), and not to paragraph (c) ("To discourage repetition of criminal acts * * * and to impose increased and added deprivation * * * upon habitual offenders * * *."). In defendant's view, that paragraph evinces the code's deterrent purpose.

Defendant's distinctions of *Phillips* are ultimately unavailing. Although we were not required in *Phillips* to determine whether the Oregon Vehicle Code has a *primarily* remedial purpose, we did so: "[Any] deterrent consequence [from the code's application] does not alter the remedial nature of the statutory scheme." 138 Or App at 474. Moreover, and significantly, we reaffirmed that conclusion in *Mannelin v. DMV*, 176 Or App 9, 31 P3d 438 (2001), *aff'd by an equally divided court*, 336 Or 147, 82 P3d 162 (2003), which *did* address an *ex post facto* challenge to a license revocation scheme.

In *Mannelin*, the petitioner driver had pleaded guilty to vehicular manslaughter in 1994, and, in accordance with the then-extant (1987) version of ORS 809.410(1), the trial court had imposed a five-year revocation of driving privileges. 176 Or App at 11. In 1995, while the petitioner was serving his criminal sentence, the legislature amended ORS 809.410(1) (1987) to extend the period of revocation to eight years, with that amendment expressly applying to, *inter alia*, persons in prison for certain vehicular crimes on the effective date of that amendment. *Id.* at 11-12; Or Laws 1995, ch 661, § 3.[2] The petitioner argued that, notwithstanding the retroactivity provision, application of the amendment to him would violate *ex post facto* protections because the longer period of revocation constituted increased "punishment" for criminal conduct that antedated the amendment. 176 Or App at 15.

We rejected that argument. We began by examining the intended purpose of the 1995 amendment and, in doing so, adopted and reiterated *Phillips*'s observation that the purpose of the Oregon Vehicle Code " 'is unquestionably remedial in nature.' " *Id.* at 17 (quoting *Phillips*, 138 Or App at 474). We then noted that the legislative history of the 1995 amendments corroborated that remedial and regulatory—as opposed to punitive—purpose. *Id.* at 17-18. Finally, after noting that the extended period of revocation imposed some additional, marginal "restraint" on "the method by which [the petitioner] may travel from place to place," we concluded that, even assuming that "restraint" resulted in "some limited punitive effect," it did not "outweigh the substantial and legitimate interest of the public in assuring safe travel on the state's highways." *Id.* at 19-20.[3]

---

[2] In 2003, the legislature repealed *former* ORS 809.410. Or Laws 2003, ch 402, §§ 6a, 43. The substance of *former* ORS 809.410(1) is retained in ORS 809.409.

[3] At the time that we decided *Mannelin*, which antedated *MacNab*, our cases, as well as the Supreme Court's cases, substantially conflated the Oregon Constitution's *ex post facto* analysis with the federal *ex post facto* analysis. *See, e.g., State v. Wille*, 317 Or 487, 501-02, 858 P2d 128 (1993) ("As has been our practice, we construe these particular state and federal provisions without distinguishing them."); *Mannelin*, 176 Or App at 16 (stating same principle). *But see State v. Fugate*, 332 Or 195, 210, 26 P3d 802 (2001) (noting some analytic differences). Accordingly, our analysis in *Mannelin* tracked the federal "intent-effects" analysis described below, 211 Or App at 125-28, rather than the *MacNab* formulation. Nevertheless, *Mannelin* remains highly instructive in several respects.

Further, and beyond our discussions in *Phillips* and *Mannelin*, the legislative history of ORS 809.235(1)(b) (2003) shows that the legislature's particular purpose in enacting that statute was primarily remedial. Our review of that history confirms that, despite some discussions of the deterrent effects of a scheme of "three-strikes" revocation, the legislative discussion focused predominantly on the statute's remedial function. For example, the bill's sponsor, Representative Jeff Barker, described the statute's purpose succinctly: "[S]omeone who gets convicted of drunk driving [multiple times] has a substance abuse problem and * * * they need to be off the road." Tape Recording, House Floor Debate, HB 2885, May 23, 2003, Tape 49, Side A; *see also* Tape Recording, House Committee on Judiciary, HB 2885, Apr 3, 2003, Tape 123, Side A (statement of Rep Jeff Barker). Further, Anne Pratt, a member of Mothers Against Drunk Driving, offered the following testimony in support of the bill:

> "Repeat drunk driving offenders are among the most stubborn, persistent and **Deadly** threats on our roads.
>
> "* * * * *
>
> "Why should we pass HB 2885? Because it could be deadly not to and we all know it only takes one event to change history. A lifetime [r]evocation for someone convicted of [three] misdemeanor DUII's could possibly mean[ ] someone[ ] else's life[—]maybe it would keep another family from a lifetime sentence without their loved one."

Testimony, House Committee on Judiciary, HB 2885, Apr 3, 2003, Ex D (statement of Anne Pratt) (emphasis in original); Tape Recording, House Committee on Judiciary, HB 2885, Apr 3, 2003, Tape 123, Side A (statement of Anne Pratt) (reiterating and expanding her written testimony).

The substance of the discussion in the Senate was similar. The remarks of Senator Joan Dukes are exemplary. Senator Dukes explained that she supported the bill because there have been too many deaths that "we could have stopped." Tape Recording, Senate Floor Debate, HB 2885, May 21, 2003, Tape 165, Side B (statement of Sen Joan Dukes). Senator Dukes further stated that "[we are] giv[ing] people far too many opportunities to kill and maim people,

and that * * * is a mistake." *Id.* In sum, the legislative history confirms that the statute's purpose was primarily remedial.[4]

In the wake of *Fugate*, and especially *MacNab*, there is some uncertainty as to the extent that review under Article I, section 21, implicates consideration of the challenged statute's allegedly "punitive" *effects*. That is, although it is apparent that the state and federal analyses are not congruent and that, therefore, the state analysis should not merely mimic the federal "intent-effects" test, *MacNab* does not appear to preclude—and, in fact, seems to contemplate—some consideration of practical effects, regardless of the expression of legislative purpose. In *Butler*, we explained:

> "The court in *MacNab* did not reach the dispositive issue in this case, that is, whether an increased risk of prolonged incarceration—a form of punishment—can itself constitute increased punishment for purposes of the third *ex post facto* prohibition. That inquiry shifts the focus from legislative intent to the effect of a statutory change. Several cases that preceded *MacNab* adopted such a focus. Although those cases also predated *Fugate* and, therefore, did not apply a separate analysis under Article I, section 21, we do not believe that the court in *MacNab* necessarily intended to supplant the principles applied in them."

194 Or App at 169. Indeed, in *MacNab* itself, the court, after examining expressions of legislative purpose, proceeded to address "[t]he operation of the law" as a "practical matter" and concluded that the registration scheme "does not *impose* any significant detriment, restraint, or deprivation." 334 Or at 480-81 (emphasis added).

Whatever the precise contours of the proper post-*MacNab* consideration of the operation and effect of a statutory scheme, we conclude that permanent revocation pursuant to ORS 809.235(1)(b) (2003) does not impose such a

---

[4] The legislature first introduced "permanent" revocation of driving privileges for DUII offenders in 2001, when it added paragraph (b) to ORS 809.235(1). Or Laws 2001, ch 786, § 1. That amendment created the provision permanently revoking the driving privileges of any person convicted of felony DUII. The legislative history of the 2001 enactment comports with the 2003 history described above. *See, e.g.,* Tape Recording, Senate Committee on Judiciary, SB 492, May 15, 2001, Tape 141, Side A (statement of Sen Verne Duncan) (stating that permanent revocation for felony DUII was necessary to "get 'em off the road").

"significant detriment, restraint, or deprivation on defendant" as to constitute "a form of increased 'punishment,'" *MacNab*, 334 Or at 481, for purposes of Article I, section 21. In *MacNab*, the court, in assessing the "practical" application of the sex offender registration scheme, noted that any criminal deterrent effect from registration was "a secondary or ancillary one, similar to the deterrent effect associated with civil sanctions such as driver license suspensions." *Id.* at 480. As support for that proposition, the court cited not only *Burbage v. Dept. of Motor Vehicles*, 252 Or 486, 491, 450 P2d 775 (1969), which involved suspension of driving privileges, but also *State v. Robinson*, 235 Or 524, 532, 385 P2d 754 (1963), in which the court stated, "[N]or do we believe that the revocation of a driver's license is punishment or is intended to be punishment." Thus, *MacNab*, far from calling into question the remedial/regulatory character of a revocation of driving privileges, at least implicitly reiterates that understanding.[5]

We thus conclude that the permanent revocation of defendant's driving privileges pursuant to ORS 809.235(1)(b) (2003) does not violate Article I, section 21.

■     We proceed to defendant's federal *ex post facto* challenge. Article I, section 10, of the United States Constitution, provides that "[n]o state shall * * * pass any * * * ex post facto Law[.]" The framers of the United States Constitution sought to prohibit the same four categories of criminal laws as the framers of the Oregon Constitution. *See Calder v. Bull*, 3 US (3 Dall) 386, 390-91, 1 L Ed 648 (1798). Again, defendant's challenge relates to the third, "greater punishment," category.

We analyze that challenge under a two-part "intent-effects" test. In *MacNab*, the court summarized that analysis:

"Under the two-part test, the first inquiry is whether the legislature intended the law in question to be punitive or regulatory. That inquiry focuses on the declared purpose of the legislature. *See generally United States v. Ward*, 448

_____

[5] We further address the effects of permanent revocation of driving privileges pursuant to ORS 809.235(1)(b) (2003) in our consideration of defendant's federal constitutional challenge. 211 Or App at 127-28.

US 242, 249, 100 S Ct 2636, 65 L Ed 2d 742 (1980) (providing example).

"* * * * *

"The second part of the analysis requires a determination of whether the registration law is nevertheless so punitive in effect that it negates the legislature's regulatory intent. *Ward*, 448 US at 249. With regard to the second inquiry, the Supreme Court has cautioned that when the legislature's declared purpose is regulatory, the party challenging the law must provide the 'clearest proof' that the effect of the law is otherwise. *See Ward*, 448 US at 248-49 (so stating)."

334 Or at 481-82.

With respect to the second, "effect"-related inquiry, a variety of nonexclusive considerations, derived from *Kennedy v. Mendoza-Martinez*, 372 US 144, 168-69, 83 S Ct 554, 9 L Ed 2d 644 (1963), a double jeopardy case, may be pertinent.[6] In *State v. Matthews*, 159 Or App 580, 978 P2d 423 (1999), which involved an *ex post facto* challenge, we noted that there was some uncertainty regarding the extent to which *Kennedy*'s construct was directly transferrable to the *ex post facto* context, 159 Or App at 588-89, but concluded that at least three considerations were apposite:

"(1) Has the requirement been historically regarded as a punishment? (2) Does the requirement involve an affirmative disability or restraint? (3) Is the scope and rigor of the registration requirement excessive in relation to its purported nonpunitive purpose?"

159 Or App at 589; *see also Mannelin*, 176 Or App at 16-17, 19-20 (employing *Matthews*'s formulation). *Cf. MacNab*, 334

---

[6] *Kennedy* formulated the factors as follows:

"Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned * * *."

372 US at 168-69 (footnotes omitted; italics in original).

Or at 482 n 16 (summarizing "[a]s applicable here," the seven *Kennedy* factors).

Our discussion above of the purposes of ORS 809.235(1)(b) (2003) is dispositive of the first inquiry under the "intent-effects" test. That is, we determined, as part of that analysis, that the Oregon legislature, in enacting ORS 809.235(1)(b) (2003), intended a regulatory, not punitive, function. *See* 211 Or App at 120-24. Thus, to prevail on his federal constitutional challenge, defendant must demonstrate that, notwithstanding the law's ostensibly regulatory purpose, there is the "clearest proof" that its effect is, in fact, punitive.

Defendant's argument regarding "punitive" effect pertains solely to the third *Matthews* factor—*viz.*, whether "the scope and rigor" of the permanent revocation of driving privileges is "excessive in relation to its purported nonpunitive purpose." *Matthews*, 159 Or App at 589. We conclude that it is not.

In *Mannelin*, we considered, and rejected, a similar argument. In holding that the retroactive extension of the license revocation period from five to eight years did not offend *ex post facto* protections, we concluded:

> "[T]he limited disability or restraint imposed by the revocation of a driver's license historically has not been regarded as punishment at all. But even assuming some limited punitive effect, it does not outweigh the substantial and legitimate interest of the public in assuring safe travel on the state's highways."

176 Or App at 19-20.

Defendant contends that *Mannelin* is materially distinguishable because the statute at issue there (1) merely extended a period of revocation, rather than compelling a permanent revocation, and (2) was triggered by conduct that actually resulted in injury or death. Defendant contends that, although an eight-year revocation may not be excessive in relation to a purpose of protecting the public from actually injurious conduct, a *permanent* revocation is excessive when no injury is involved.

Defendant's distinctions are unpersuasive. The danger to public health and safety arising from even a single incident of DUII is manifest. But here, "permanent"[7] revocation is not triggered following a single conviction. Rather, the statute applies only after three convictions. That is, it applies only after multiple recidivist incidents of drunken driving by defendants who persist in such potentially lethal conduct—and who persist notwithstanding having twice previously suffered severe sanctions, including substantial deprivation of driving privileges. Permanent revocation is not excessive in relation to the remedial purpose of protecting defenseless Oregonians from such repeated, life-threatening conduct.

Affirmed.

---

[7] "Permanent" revocation under ORS 809.235(1)(b) is not necessarily permanent. Under ORS 809.235(2), a person whose driving privileges have been "permanently" revoked may petition the court for restoration of those privileges 10 years after being released on parole or post-prison supervision or being sentenced to probation. ORS 809.235(2)(a). The court may reinstate the person's driving privileges after considering a variety of factors:

"(3) The court shall hold a hearing on a petition filed in accordance with subsection (2) of this section. In determining whether to grant the petition, the court shall consider:

"(a) The nature of the offense for which driving privileges were revoked.

"(b) The degree of violence involved in the offense.

"(c) Other criminal and relevant noncriminal behavior of the petitioner both before and after the conviction that resulted in the revocation.

"(d) The recommendation of the person's parole officer, which shall be based in part on a psychological evaluation ordered by the court to determine whether the person is presently a threat to the safety of the public.

"(e) Any other relevant factors.

"(4) If, after a hearing described in subsection (3) of this section, the court is satisfied by clear and convincing evidence that the petitioner is rehabilitated and that the petitioner does not pose a threat to the safety of the public, the court shall order the petitioner's driving privileges restored."

ORS 809.235.