NAKAMOTO, J.
**266 When a defendant has been convicted of driving under the influence of intoxicants (DUII) three times in a 10-year period, the third DUII offense becomes a felony. ORS 813.010(5). In this case, defendant was charged with felony DUII based on his two prior convictions in the preceding 10 years, but he successfully asserted a statutory challenge to one of them, a Georgia conviction, because it had been obtained in violation of his right to legal counsel. See ORS 813.328(1) (a defendant may challenge "the validity of prior convictions alleged by the state" as an element of felony DUII). As a result, defendant was convicted of misdemeanor rather than felony DUII. However, the trial court counted the Georgia conviction when it permanently revoked defendant's driving privileges. See ORS 809.235(1)(b) (court shall permanently revoke a defendant's driving privileges when convicted for a third time of DUII).[1] The Court of Appeals affirmed without opinion. State v. Hamann , 282 Or. App. 369, 385 P.3d 103 (2016).
On review, defendant reasserts that, once he proved that the Georgia conviction was constitutionally invalid, the trial court's imposition of any additional consequence on him based on that conviction was inconsistent with his right to counsel, as articulated in City of Pendleton v. Standerfer , 297 Or. 725, 688 P.2d 68 (1984) (applying Sixth Amendment right to counsel). We conclude that the trial court correctly relied on the Georgia conviction to revoke defendant's driving privileges as a civil disability-not a criminal punishment-and that the revocation was consistent with defendant's right to counsel under the Sixth Amendment to the United States Constitution. Therefore, we affirm the judgment of the trial court and the decision of the Court of Appeals.
FACTS
The relevant facts are undisputed. Defendant drove while under the influence of alcohol and was arrested. The **267 state charged him with felony DUII because defendant had two previous DUII convictions. See ORS 813.010(5) (a person's third DUII within a 10-year period is a Class C felony). Defendant had been convicted of DUII in Georgia in 2007, and then again in Clackamas County, Oregon in 2010.
Before trial, defendant moved to prohibit the use of the 2007 Georgia DUII conviction to aggravate the DUII from a misdemeanor to a felony. During the hearing on that motion, defendant testified that he had pleaded guilty to the Georgia DUII, but that he did not have an attorney at the time of his plea and was not advised about the benefits of having an attorney or the risks of proceeding *195 without one. He also testified that, at the time of his arraignment in Georgia, he did not know that he had a right to counsel.
After hearing evidence about the Georgia proceeding, the trial court in this case determined that the Georgia conviction could not be used against defendant to aggravate the DUII from a misdemeanor to a felony, noting that the record from the Georgia case did not contain any indication that there had been a valid waiver of the right to counsel. The court proceeded with a stipulated facts trial and found defendant guilty. Accordingly, the trial court convicted defendant of misdemeanor DUII as a lesser-included offense.
At sentencing, defendant moved to prohibit the use of the 2007 Georgia DUII conviction to permanently revoke his driving privileges under ORS 809.235(1)(b). Defendant argued that the court's determination that the Georgia conviction was obtained in violation of Article I, section 11, of the Oregon Constitution and the Sixth Amendment of the United States Constitution meant that the Georgia conviction was invalid as a matter of Oregon law and could not be used for any purpose. The trial court disagreed and imposed a permanent revocation of defendant's driving privileges.
Defendant appealed, arguing that Article I, section 11, and the Sixth Amendment both prohibited the use of uncounseled prior convictions to impose a less favorable disposition in a later proceeding. The Court of Appeals affirmed without issuing a written opinion.
**268 ANALYSIS
On review, defendant argues that the trial court's use of the prior uncounseled DUII conviction to permanently revoke his driving privileges as part of his criminal sentence violated his right to counsel under Article I, section 11, and the Sixth Amendment. For the reasons stated below, we decide only the Sixth Amendment issue, and we begin with that analysis.
The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his [defense]." The Sixth Amendment requires that a defendant in a criminal prosecution have the benefit of counsel or that the defendant validly waive counsel. Gideon v. Wainwright , 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The right to counsel also extends to plea proceedings. Padilla v. Kentucky , 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). The parties have assumed, as do we, that defendant's Georgia DUII conviction was obtained in violation of defendant's Sixth Amendment right to counsel.
Over 50 years ago, the United States Supreme Court stated that the Sixth Amendment prohibits the use of an uncounseled prior conviction obtained in violation of the right to counsel to "support guilt or enhance punishment for another offense." Burgett v. Texas , 389 U.S. 109, 115, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967) ; accord United States v. Bryant , --- U.S. ----, 136 S.Ct. 1954, 1962, 195 L.Ed.2d 317 (2016) (quoting Burgett with approval). Burgett involved an uncounseled state felony conviction, which the Court held could not be used to prove a prior-felony element of a state recidivist statute. 389 U.S. at 115, 88 S.Ct. 258.
But since Burgett , the Supreme Court has held that uncounseled convictions are not invalid for all purposes. In Lewis v. United States , 445 U.S. 55, 65-67, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), the Court explained that use of an uncounseled prior conviction to impose a later consequence violates the Sixth Amendment if that later consequence is a punishment enhancement, but the Sixth Amendment is not violated if that later consequence is only a civil disability. The Court held that an uncounseled prior felony conviction **269 could be used to support the defendant's misdemeanor conviction for violating the prohibition on felons possessing firearms, when he was not sentenced to any incarceration. Id. at 65-67, 100 S.Ct. 915. The Court determined that an uncounseled prior conviction could be used to enforce an "essentially civil disability through a criminal sanction," because such a use would not " 'support guilt or enhance punishment.' " Id. at 67, 100 S.Ct. 915 (quoting Burgett , 389 U.S. at 115, 88 S.Ct. 258 ). Thus, whether the Sixth Amendment prohibits the use of defendant's uncounseled Georgia conviction to support the *196 permanent revocation of defendant's driving privileges under ORS 809.235 boils down to whether the revocation of driving privileges is essentially a "civil disability" as in Lewis , which the state urges, or a punishment enhancement as in Burgett , which defendant urges.
The Supreme Court, however, has not stated a test to draw the line between civil disability and punishment enhancement for purposes of determining whether an uncounseled conviction can be used to impose a particular consequence. The Court's opinion in Lewis set out the distinction between civil disabilities and criminal penalties, but gave little indication as to how to differentiate between the two, aside from the conclusory statement that enforcement of a civil disability does not "support guilt or enhance punishment." Lewis , 445 U.S. at 67, 100 S.Ct. 915 (quoting Burgett , 389 U.S. at 115, 88 S.Ct. 258 ).
Therefore, to make that determination in this case, we look beyond Sixth Amendment right-to-counsel jurisprudence to see how that distinction plays out in other contexts. The Double Jeopardy Clause and Ex Post Facto Clause are particularly useful because they require the same fundamental inquiry as the Sixth Amendment issue at hand: whether a particular consequence is a punishment. The Double Jeopardy Clause requires a determination as to whether a particular consequence is a criminal punishment because it prohibits punishing a person twice for the same offense; however, imposing a punitive sanction and a civil sanction for the same offense is permitted. See Helvering v. Mitchell , 303 U.S. 391, 399-400, 58 S.Ct. 630, 82 L.Ed. 917 (1938) (stating rule). Thus, some cases involving **270 the Double Jeopardy Clause analyze whether a particular consequence is a criminal punishment or merely a civil sanction. See id. at 399, 58 S.Ct. 630 (stating the issue as "whether [a statute] imposes a criminal sanction"). Likewise, the Ex Post Facto Clause prohibits retroactive punishment, so cases applying it may include consideration of whether the consequence to be imposed is a criminal punishment. See, e.g. , Smith v. Doe , 538 U.S. 84, 89, 92-93, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (stating the issue as whether required registration for sex offenders "is a retroactive punishment prohibited by the Ex Post Facto Clause" and providing a test to determine whether the requirement is a criminal punishment).
In a number of cases applying the Double Jeopardy Clause and Ex Post Facto Clause, the Supreme Court has used the same two-factor, intent-effects test: First, did the legislature intend for a particular result to be civil or criminal? Second, if the legislature intended to create a civil penalty, is the effect nonetheless so punitive as to negate that intention? See, e.g. , Smith , 538 U.S. at 92, 123 S.Ct. 1140 (stating test in context of the Ex Post Facto Clause); Hudson v. United States , 522 U.S. 93, 98-100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (stating test in context of Double Jeopardy Clause).
The Supreme Court also has enumerated a list of seven factors to determine whether federal legislation is criminal in nature, first described in Kennedy v. Mendoza-Martinez , 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). That case involved whether the protections in the Fifth and Sixth Amendments for criminal proceedings were required when a person's American citizenship was at risk of divestment for draft evasion or military desertion. Id. at 167, 83 S.Ct. 554. Mendoza-Martinez was decided before the Supreme Court's decision in Lewis , but it is nonetheless useful to help determine whether or not a consequence is penal. In Smith , 538 U.S. at 97, 123 S.Ct. 1140, the Court explained that, in analyzing effects in the intent-effects test, the Court would refer to the seven factors as "a useful framework."
The seven Mendoza-Martinez factors are: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it was historically regarded as punishment; (3) whether it requires a finding of scienter ; (4) whether it **271 serves the traditional aims of punishment; (5) whether the behavior to which it applies is already a crime; (6) whether there is a rational non-punitive purpose; and (7) whether it appears excessive in relation to the non-punitive purpose. Mendoza-Martinez , 372 U.S. at 168-69, 83 S.Ct. 554. The Court has noted that those *197 factors are "neither exhaustive nor dispositive," United States v. Ward , 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), but are "useful guideposts," Hudson , 522 U.S. at 99, 118 S.Ct. 488.
In this case, we also merge those approaches by applying the intent-effects test with consideration of the Mendoza-Martinez factors. First, we look to legislative intent to determine if the driving privilege revocation was intended to be a punitive or civil sanction. If we determine that the legislature intended a civil sanction, then we look to whether the effect of the revocation is nonetheless so punitive as to negate that intent, and, in doing that, we consider the relevant Mendoza-Martinez factors. Ultimately, we conclude that the legislature intended the permanent driving privilege revocation to be a civil, remedial sanction, aimed at safeguarding public safety. We further conclude that the effect of the revocation does not negate that remedial purpose and that consideration of the relevant Mendoza-Martinez factors supports that conclusion.
We first review the text, context, and legislative history of ORS 809.235 to determine the legislative intent behind the statute. The trial court ordered the revocation of defendant's driving privileges under ORS 809.235(1)(b), which provides:
"The court shall order that a person's driving privileges be permanently revoked if the person is convicted of felony driving while under the influence of intoxicants in violation of ORS 813.010 or if the person is convicted for a third or subsequent time of any of the following offenses in any combination:
"(A) Driving while under the influence of intoxicants in violation of:
"(i) ORS 813.010 ; or
"(ii) The statutory counterpart to ORS 813.010 in another jurisdiction.
**272 "(B) A driving under the influence of intoxicants offense in another jurisdiction that involved the impaired driving of a vehicle due to the use of intoxicating liquor, cannabis, a controlled substance, an inhalant or any combination thereof.
"(C) A driving offense in another jurisdiction that involved operating a vehicle while having a blood alcohol content above that jurisdiction's permissible blood alcohol content."
On its face, the text of ORS 809.235(1)(b) does not indicate the legislative purpose of the revocation of driving privileges. But in the context of other provisions of the statute, the rationale behind the revocation provision appears to have been to promote public safety.
Under ORS 809.235(2)(a), after 10 years, a person who has had driving privileges revoked may petition the court "for an order restoring the person's driving privileges." And under ORS 809.235(4), the court "shall order a petitioner's driving privileges restored" if
"the court finds by clear and convincing evidence that the petitioner:
"(a) Is rehabilitated;
"(b) Does not pose a threat to the safety of the public; and
"(c) If the sentence for the crime for which the petitioner's driving privileges were revoked required the petitioner to complete an alcohol or drug treatment program, has completed an alcohol or drug treatment program in a facility approved by the Director of the Oregon Health Authority or a similar program in another jurisdiction."
Thus, the restoration procedure permits a person to prove that he or she is "rehabilitated" and no longer "a threat to the safety of the public," thereby justifying restoration of driving privileges. That required showing of a petitioner seeking restoration of driving privileges indicates that the legislature's primary concern in mandating the driving privilege revocation was to promote public safety.
Legislative history confirms that the legislature's intention was to protect the public from repeat impaired **273 drivers. The permanent driving privilege revocation in ORS 809.235 originated in 2001 with Senate Bill (SB) 492. That bill introduced the permanent driving privilege revocation for any defendant convicted of a felony DUII. Or. Laws 2001, ch. 786, § 1. Senator Peter Courtney, *198 who introduced the bill, explained to the Senate Committee on Judiciary that the bill was necessary to send a message to people with serious drinking problems. Audio Recording, Senate Committee on Judiciary, SB 492, May 15, 2001, at 45.26 (statement of Sen. Peter Courtney), http://records.sos.state.or.us/ORSOSWebDrawer/Record/4160644# (accessed June 28, 2018). Senator Verne Duncan added that the bill would help "get 'em off the road." Id. at 48.38 (comment of Sen. Verne Duncan). Senator Courtney again testified before the House Committee on Rules, Redistricting and Public Affairs, saying that "the point [is] this: we are not going to wait for a habitual drunk driver to kill or injure before revoking their license to drive. *** This bill makes sure they don't get behind the wheel of a car." Audio Recording, House Committee on Rules, Redistricting and Public Affairs, SB 492, June 21, 2001, at 2:13.25 (statement of Sen. Peter Courtney), http://oregon.granicus.com/MediaPlayer.php?view_id=42&clip_id=19552 (accessed June 28, 2018). Those statements all point to a public safety rationale: preventing people who habitually drive while intoxicated from killing or injuring other people.
"In 2003, the legislature amended ORS 809.235 to require permanent revocation of a person's driver's license 'if the person is convicted of misdemeanor driving while under the influence of intoxicants under ORS 813.010 for a third time.' " State v. Kellar , 349 Or. 626, 632, 247 P.3d 1232 (2011). That portion of ORS 809.235 was originally introduced as House Bill (HB) 2885 (2003). Or. Laws 2003, ch. 346, § 2. Again, discussion in the legislature surrounding HB 2885 focused on the danger to the community that is presented by people who repeatedly drive while under the influence.
Representative Jeff Barker, one of the sponsors of HB 2885, introduced the bill in the Senate Committee on Judiciary by stating that he did not think it was "necessary to give *** a long speech about the dangers of driving while intoxicated. Most of us know someone who's been hurt **274 either physically or emotionally by an intoxicated driver." Audio Recording, Senate Committee on Judiciary, HB 2885, May 15, 2003, at 16.58 (statement of Rep Jeff Barker), http://oregon.granicus.com/MediaPlayer.php?view_id=30&clip_id=12810 (accessed June 28, 2018). Both the House and Senate heard testimony from members of Crime Victims United, Mothers Against Drunk Driving, and Parents of Murdered Children, who gave statistics about the dangers of driving while intoxicated. See, e.g. , Audio Recording, House Committee on Judiciary, HB 2885, Apr. 3, 2003, at 1:53.10 (statement of Anne Pratt), http://oregon.granicus.com/MediaPlayer.php?view_id=30&clip_id=11433 (accessed June 28, 2018).
And during the floor debate on HB 2885, Senator Joan Dukes invoked public safety. She stated that she supported HB 2885 because it was an incremental improvement that was necessary because "we have given people far too many opportunities to kill and maim people. *** [T]his bill is an improvement, but at this rate, we're gonna have a lot more deaths from drunk drivers that we could have stopped if we would simply have the guts to strengthen these laws." Audio Recording, Senate Chamber, HB 2885, May 21, 2003, at 1:00.50 (statement of Sen. Joan Dukes), http://oregon.granicus.com/MediaPlayer.php?view_id=30&clip_id=12471 (accessed June 28, 2018).[2]
In contrast, the purpose of a punitive sanction is, at least in part, to punish a person whom the legislature has determined is deserving of punishment. See Henry M. Hart, Jr., The Aims of the Criminal Law , 23 Law & Contemp Probs 401, 404 (1958) ("What distinguishes a criminal from a civil sanction * * * is the judgment of community condemnation which accompanies and justifies its imposition."). A few remarks in the legislative history could suggest that part of the rationale for the permanent driving privilege revocation was to punish drunk drivers. However, punishment does not seem to have been the legislature's primary motivation. As described above, the vast majority of the testimony on SB
**275 492 in 2001 and on HB
*199 2885 in 2003 focused on the necessity of permanently revoking driving privileges for people who repeatedly drive under the influence of intoxicants, in order to protect public safety. In short, the legislative history strongly indicates that the legislature's purpose in imposing the permanent driving privilege revocation was remedial, not punitive.
We next consider the effect of the permanent driving privilege revocation and weigh that effect against the legislature's remedial purpose. See Smith , 538 U.S. at 92, 123 S.Ct. 1140. In this case, the effect of the consequence does not outweigh the public safety purpose that appears from ORS 809.235 as a whole and from the legislative history of the revocation sanction that the statute contains. There is no doubt that, as defendant argues, the revocation of a person's driving privileges can have a huge impact on that person's life and ability to work. See Bell v. Burson , 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) ("Once licenses are issued *** their continued possession may become essential in the pursuit of a livelihood."). However, the statute appropriately balances that effect against the legislature's remedial purpose. First, because permanent revocation of driving privileges is not imposed after only one or even two DUII convictions, it appears that instead of seeking retribution, as defendant suggests, the legislature sought to balance the hardship of a driving privilege revocation against the need to reduce the risk of death and injury by taking repeat DUII offenders off Oregon roads and highways. Second, ORS 809.235 (2)(a) allows a person whose driving privileges have been permanently revoked to petition for an order restoring driving privileges after 10 years. Even a "permanent" revocation is not entirely permanent if the court determines that a particular person has successfully effected long-term behavioral changes and can once again be allowed driving privileges without posing a significant danger to society. ORS 809.235(4).
Once a court determines that the legislature intended the revocation to be remedial, a defendant faces a difficult burden. The United States Supreme Court has stated that " 'only the clearest proof' " can override the legislature's remedial intent, thereby reforming the sanction from a **276 civil disability into a criminal penalty. Ward , 448 U.S. at 249, 100 S.Ct. 2636 (quoting Flemming v. Nestor , 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) ). To determine whether such proof exists in this case, we apply the Mendoza-Martinez factors.
The first factor asks "[w]hether the sanction involves an affirmative disability or restraint." Mendoza-Martinez , 372 U.S. at 168, 83 S.Ct. 554. That term has been interpreted to mean something "approaching the 'infamous punishment' of imprisonment." Flemming , 363 U.S. at 617, 80 S.Ct. 1367. The permanent driving privilege revocation in this case does not rise to that level. See Hudson , 522 U.S. at 104, 118 S.Ct. 488 (determining that a banker's indefinite debarment from participating in the banking industry was not an "affirmative disability or restraint" for Double Jeopardy purposes).
The next Mendoza-Martinez factor asks whether the sanction "has historically been regarded as a punishment." Mendoza-Martinez , 372 U.S. at 168, 83 S.Ct. 554. The revocation of driving privileges at issue in this case is not such a sanction. The United States Supreme Court has determined that "revocation of a privilege voluntarily granted" is "characteristically free of the punitive criminal element." Helvering , 303 U.S. at 399, 58 S.Ct. 630. Driving privileges are just that-privileges. Accordingly, their revocation is not necessarily punitive.
On that point, defendant also contends that the revocation must be a criminal punishment because it appears on the face of the criminal judgment. That argument is unavailing. The legislature's decision to permanently revoke driving privileges under ORS 809.235(1)(b) must be implemented, and the defendant subject to the revocation must be notified of it. The fact that the chosen procedural mechanism to do so is to include the revocation in the criminal judgment does not, alone, prove that the revocation is a criminal punishment. For example, in Smith , 538 U.S. at 90, 123 S.Ct. 1140, the United States Supreme Court considered a requirement that certain convicted defendants register as sex offenders. The Court determined that that requirement was not a criminal punishment *200 for purposes of the Ex Post Facto Clause, even though it was included in the criminal judgment. Id. at 95, 123 S.Ct. 1140. The Court noted that the inclusion of the requirement in the criminal judgment was "to alert convicted offenders to the **277 civil consequences of their criminal conduct" and that that policy "does not render the consequences themselves punitive." Id. at 95-96, 123 S.Ct. 1140. It is logical, the Court determined, for a state to provide persons affected by a regulatory scheme with unambiguous notice of its requirements. Id. at 96, 123 S.Ct. 1140.
In this case, that same notification purpose is served by including notice of the permanent driving privilege revocation in the criminal judgment. The sentencing court orders the revocation, but the Department of Motor Vehicles ultimately enforces it. As provided in ORS 809.280(10), "[u]pon receipt of a court order under ORS 809.235, the department shall permanently revoke the person's driving privileges" and "[t]he revocation shall remain in effect until the department is notified by a court that the person's driving privileges have been ordered restored." Therefore, inclusion of the revocation on the face of the criminal judgment is not conclusive.
We next ask whether the revocation "will promote the traditional aims of punishment-retribution and deterrence." Mendoza-Martinez , 372 U.S. at 168, 83 S.Ct. 554. It is quite possible that the threat of a permanent driving privilege revocation serves a deterrent purpose-indeed, for some defendants, such a revocation may be more onerous than a short jail stay. However, the Supreme Court has noted that deterrence "may serve civil as well as criminal goals." United States v. Ursery , 518 U.S. 267, 292, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). Moreover, the duration of the revocation does not automatically make it a punishment. See U.S. v. Imngren , 98 F.3d 811, 816 (4th Cir. 1996) (determining that the length of a one-year suspension of driving privileges does not render it punitive, and noting that "the argument that suspending a motorist's driving privileges is punitive because some element of deterrence is involved is without merit").
Two of the Mendoza-Martinez factors do not contribute much to our analysis. The first is whether the consequence requires a finding of scienter . Mendoza-Martinez , 372 U.S. at 168, 83 S.Ct. 554. A third conviction for DUII does not require a finding of a particular mens rea , so this factor seems to cut toward the revocation being a civil disability. The other factor is whether the behavior to which the consequence applies **278 is already a crime, which arguably cuts in defendant's favor. Id. However, as discussed above, the fact that the revocation is associated with a criminal judgment is not conclusive, and many federal courts applying Mendoza-Martinez have downplayed that factor. See, e.g., Herbert v. Billy , 160 F.3d 1131, 1138 (6th Cir. 1998) ("[W]hile the statutory scheme may intertwine the license suspension with the arrest for drunken driving, this is not sufficient to render the suspension criminally punitive in the Double Jeopardy context. To hold otherwise would undermine the state's ability to effectively regulate its highways.").
The last two pertinent Mendoza-Martinez factors relate to whether there is a rational alternative purpose, aside from punishment, for the consequence, and whether it appears excessive in light of that alternate purpose. Mendoza-Martinez , 372 U.S. at 168-69, 83 S.Ct. 554. As discussed earlier, the legislature's purpose in enacting ORS 809.235(1)(b) was public safety, not punishment. Moreover, we have determined that the permanent driving privilege revocation is not excessive in relation to that remedial purpose.
Having applied the Mendoza-Martinez factors, we do not find sufficient proof that the revocation is punitive to outweigh the legislature's remedial purpose in enacting ORS 809.235(1)(b). Accordingly, we conclude that the Sixth Amendment is not violated by using defendant's uncounseled Georgia conviction for DUII as a predicate for revocation of his driving privileges, because the revocation of his driving privileges is a civil disability, not an enhancement of punishment.
Other state and federal courts have come to the same conclusion. See Herbert , 160 F.3d 1131 (holding that a license suspension is not a punishment for Double Jeopardy purposes);
*201 State v. O'Neill , 473 A.2d 415 (Me. 1984) (holding that use of an uncounseled conviction to impose a civil motor-vehicle-operation disability did not violate the defendant's Sixth Amendment rights); Patterson v. State , 938 So.2d 625 (Fla. 2d DCA 2006) (holding that use of uncounseled pleas to support the defendant's designation as a habitual traffic offender and to revoke his driver's license did not **279 violate the defendant's Sixth Amendment rights); Musick v. Kansas Dept. of Revenue , 16 Kan.App.2d 462, 825 P.2d 531, 537 (1992) (holding that the defendant's "Sixth Amendment right to counsel is not violated by the Department's reliance upon a prior uncounseled conviction of DUI as a basis for extending the period of driver's license suspension").
Moreover, that result is consistent with this court's past treatment of driving privilege sanctions. For example, in State v. MacNab , 334 Or. 469, 480, 51 P.3d 1249 (2002), this court included driver's license suspensions in a list of civil sanctions. In Burbage v. Department of Motor Vehicles , 252 Or. 486, 491, 450 P.2d 775 (1969), this court held that a petitioner challenging his driver's license suspension based on his refusal to take a breathalyzer test was not entitled to a jury trial because "no criminal penalty [was] possible." And similarly, in State v. Robinson , 235 Or. 524, 532, 385 P.2d 754 (1963), this court held that the defendant's appeal from a DUII conviction did not present any issue as to the validity of a driving privilege revocation statute because this court did not "believe that the revocation of a driver's license is punishment or is intended to be punishment."[3]
We next turn to defendant's argument that, by using his uncounseled Georgia conviction to revoke his driving privileges, the trial court violated his rights under Article I, section 11, of the Oregon Constitution. Article I, section 11, provides, in part: "In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel * * *."
Defendant's overarching argument is that barring the state's use of an uncounseled prior conviction to enhance sentencing consequences vindicates his individual right to counsel under Article I, section 11. More specifically, defendant asserts two primary arguments under Article I, section 11. First, defendant contends that the sentencing court's permanent revocation of his driving privileges is **280 "inseparable from the criminal conviction, regardless of any non-criminal purpose or effect" of the sanction, and, thus, that it is a direct, additional consequence of his uncounseled criminal conviction that is prohibited under Article I, section 11. In effect, defendant urges a per se rule based on whether the court (as opposed to an administrative agency) issues the sanction. Second, he argues, even standing alone, the permanent revocation of his driving privileges constitutes a criminal, punitive sanction, and Article I, section 11, prohibits using his uncounseled Georgia conviction to impose such a sanction.
To a large extent, defendant's arguments are based on his view that the scope of the right to counsel under Article I, section 11, is broader than that afforded under the Sixth Amendment. But, as we next explain, defendant does not sufficiently develop an argument supporting that underlying premise for us to consider the merits of his Article I, section 11, arguments.
To determine the meaning of a provision of the original Oregon Constitution, this court in Priest v. Pearce , 314 Or. 411, 415-16, 840 P.2d 65 (1992), examined the text of the provision in context, the historical circumstances leading to the adoption of the provision, and the case law construing it. But defendant offers no textual or historical analysis of Article I, section 11, to support his argument that using the uncounseled Georgia conviction as part of the calculus to revoke his driving privileges violates Article I, section 11.
*202 Defendant instead relies heavily on a single paragraph from this court's opinion in Standerfer , 297 Or. at 729, 688 P.2d 68, to contend that Article I, section 11, applies "more broadly" than the Sixth Amendment. In that passage, we noted that Article I, section 11, and the Sixth Amendment differ in their applicability. Both provisions guarantee the right to counsel in any "criminal prosecution," but in misdemeanor prosecutions, the Sixth Amendment only applies to those cases in which actual imprisonment is imposed. Standerfer , 297 Or. at 729, 688 P.2d 68 (citing Scott v. Illinois , 440 U.S. 367, 99 S.Ct. 1158, 59 L.Ed.2d 383 (1979) ). Article I, section 11, we noted, "is not so limited," and further postulated:
**281 "[I]f we were to consider collateral use of prior convictions under article I, section 11, enhancement of the offense or of the term of imprisonment would be only one consideration. It would be necessary to address, in addition, whether the prior conviction causes the second offense to be treated in a punitive manner reflective of criminal rather than civil penalties."
Id. From that passage, defendant draws the conclusion that "this court recognized that Article I, section 11, would likely prohibit the use of uncounseled prior convictions even more broadly than the Sixth Amendment."[4]
But this court's limited statement in Standerfer about Article I, section 11, was dicta . Standerfer was ultimately decided under the Sixth Amendment, not under Article I, section 11. Id. at 727, 688 P.2d 68. In fact, the defendant in that case did not even raise a claim under Article I, section 11. Id. at 727 n 1, 688 P.2d 68. The dicta in Standerfer that defendant relies on is not sufficient to support his argument that Article I, section 11, provides for a broader prohibition on the use of a prior uncounseled conviction to revoke driving privileges than does the Sixth Amendment.
In sum, the permanent revocation of driving privileges under ORS 809.235(1)(b) is a civil disability, not a punishment enhancement, in the context of defendant's contention that his Sixth Amendment right to counsel prohibited the trial court from relying on the Georgia conviction to permanently revoke defendant's driving privileges. And, because the parties have not presented well developed arguments concerning Article I, section 11, we decline to **282 consider whether Article I, section 11, barred the trial court from using defendant's Georgia conviction to permanently revoke his driving privileges.
The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

ORS 809.235 has been amended since defendant was convicted. However, because that amendment does not affect our analysis, we refer to the current version of the statute in this opinion.

In 2005, the legislature again expanded the permanent driving privilege revocation to people convicted of their third DUII, in violation of ORS 813.010or its statutory counterpart in other jurisdictions. Kellar , 349 Or. at 632, 247 P.3d 1232.

Our conclusion is also consistent with the common understanding of "civil disability" as a legal term. Black's Law Dictionary defines "civil disability" as "[t]he condition of a person who has had a legal right or privilege revoked as a result of a criminal conviction, as when a person's driver's license is revoked after a DWI conviction ." Black's Law Dictionary 560 (10th ed. 2014) (emphasis added).

The entirety of the passage in Standerfer , 297 Or. at 729, 688 P.2d 68, reads:
"Article I, section 11 is not so limited. Brown v. Multnomah County Dist. Ct. , [280 Or. 95, 570 P.2d 52 (1977) ], does not confine the definition of 'criminal prosecution' to those misdemeanor cases in which imprisonment is actually or even potentially to be imposed. Other considerations, such as the punitive significance of the penalty, collateral consequences and use of pretrial arrest and detention, will determine whether the procedure is criminal and, hence, whether the state must afford the accused the rights, including the right to counsel, guaranteed in a criminal prosecution. Similarly, if we were to consider collateral use of prior convictions under article I, section 11, enhancement of the offense or of the term of imprisonment would be only one consideration. It would be necessary to address, in addition, whether the prior conviction causes the second offense to be treated in a punitive manner reflective of criminal rather than civil penalties."