Argued and submitted November 17, 2020; order of circuit court reversed, and case remanded to circuit court for further proceedings May 6, 2021

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

MICHAEL JOHN WOLFE,
*Defendant-Respondent.*

(CC 19CR34514) (SC S067623)

486 P3d 748

Defendant moved to dismiss a charge of aggravated murder, arguing that changes made to capital sentencing by Senate Bill (SB) 1013, a law enacted after the crime was alleged to have been committed, violated the *ex post facto* clauses of the state and federal constitutions. The trial court granted the motion to dismiss, and the state appealed. *Held*: (1) SB 1013 does not bar the state from charging defendant with aggravated murder; (2) the change made by SB 1013 to the elements of the charged theory of aggravated murder was not an unconstitutional *ex post facto* law, as the change was ameliorative; and (3) the appropriate remedy for an *ex post facto* violation from SB 1013's changes to capital sentencing is for defendant to be sentenced under the sentencing provisions in place at the time of the offense, not the dismissal of the aggravated murder charge.

The order of the circuit court is reversed, and the case is remanded to circuit court for further proceedings.

En Banc

On appeal from an order of the Yamhill County Circuit Court under ORS 138.045(2) and ORAP 12.07.*

Patrick M. Ebbett, Assistant Attorney General, Salem, argued the cause and filed the briefs for appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Ernest G. Lannet, Chief Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for respondent.

Jeffrey Erwin Ellis, Oregon Capital Resource Center, Portland, and Richard L. Wolf, Richard L. Wolf PC, Portland,

_____

* Cynthia L. Easterday, Judge.

filed the brief for *amicus curiae* Oregon Capital Resource Center.

WALTERS, C. J.

The order of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**WALTERS, C. J.**

In Oregon, the crime of aggravated murder can be punished by death. In 2019, the state charged defendant with aggravated murder as that crime was then defined. Later in 2019, the legislature passed Senate Bill (SB) 1013, narrowing the definition of aggravated murder and amending the statute governing death penalty sentences. *See* Or Laws 2019, ch 635 (session law of enacted version of SB 1013). The state filed an amended indictment charging defendant with aggravated murder as redefined by SB 1013. Defendant sought dismissal of the aggravated murder charge based on the *ex post facto* clauses of the Oregon and United States Constitutions. The trial court granted defendant's motion, and the state filed this direct, interlocutory appeal. We conclude that the trial court erred; we reverse the order of dismissal and remand the case to the trial court for further proceedings.

## I.   BACKGROUND

In June 2019, defendant was charged by indictment with three counts of aggravated murder and two counts of first-degree kidnapping, all alleged to have been committed on or about May 13, 2019. The first charge of aggravated murder alleged that defendant had "unlawfully and intentionally cause[d] the death of [WF], a human being under the age of fourteen years." The second and third aggravated murder charges alleged that defendant had killed two victims, WF and KF, in the same criminal episode. At that time, the crime of aggravated murder was defined to include both charged aggravating circumstances. *See* ORS 163.095(1)(f) (2017) (intentional homicide of a person under the age of 14); ORS 163.095(1)(d) (2017) (homicide of more than one victim in same criminal episode).

Before defendant's trial occurred, the legislature passed SB 1013. The Governor signed the bill, and the law took effect on September 29, 2019. As noted, that bill made changes to the definition of aggravated murder and the statute governing capital sentencing. We will describe those changes in more detail below.

In October 2019, the state responded to the passage of SB 1013 by obtaining an amended indictment, alleging only one count of aggravated murder. The state alleged that defendant "unlawfully, intentionally, *and with premeditation* cause[d] the death of [WF], a human being under the age of fourteen years." (Emphasis added.) The state also charged defendant with four counts of first-degree murder and two counts of first-degree kidnapping. All of those offenses were alleged to have taken place "on or about May 13, 2019 to May 15, 2019."

Defendant filed a motion to dismiss the amended aggravated murder charge, arguing that applying the new definition of aggravated murder to him violated the *ex post facto* clauses of the state and federal constitutions. Defendant reasoned that, because SB 1013 had changed the elements of aggravated murder after his crime had occurred, the amended statute could not constitutionally be applied to him.

The state responded with an argument that the conduct that defendant was charged with—the unlawful, intentional, and premeditated killing of a child under 14 years old—had been punishable as aggravated murder at the time of defendant's crimes. The state contended that, because the only pertinent change to the elements of the crime—the *addition* of the requirement that the murder be premeditated—was ameliorative, the *ex post facto* clauses did not prevent it from being applied to defendant.

The trial court agreed with the state and denied defendant's motion.

Defendant then filed a motion for reconsideration. In that motion, he made a different *ex post facto* argument based on SB 1013's change to the capital sentencing process. Before the enactment of SB 1013, Oregon law had required that four questions be submitted to the jury in the penalty phase of a death penalty trial. For the death sentence to be imposed, the state had needed to convince a jury, beyond a reasonable doubt, that the answer to each of the first three questions was "yes." ORS 163.150(1)(d) (2017). One of those first three questions had asked "[w]hether there

is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." ORS 163.150(1)(b)(B) (2017). The fourth question had asked the jury whether the defendant should receive a death sentence. ORS 163.150(1)(b)(D) (2017). No specific burden of proof had been attached to that final question. SB 1013 altered those questions in two ways. First, it eliminated the "continuing threat" question. *See* Or Laws 2019, ch 635, § 5; ORS 163.150(1)(b). Second, it attached a "beyond a reasonable doubt" standard to the final question. *See* Or Laws 2019, ch 635, § 5; ORS 163.150(1)(d).

In his motion for reconsideration, defendant argued that, by removing the "continuing threat" question, SB 1013 had lessened the burden of proof that the state needed to carry before a death sentence could be imposed. He contended that the elimination of the "continuing threat" question, when applied to crimes committed before SB 1013 was enacted, was an *ex post facto* law under both the state and federal constitutions. Defendant argued that, as a result, he could not be charged with aggravated murder under SB 1013, and, therefore, that that charge should be dismissed.

In response, the state conceded that, "[a]bsent defendant's consent, * * * it would be an *ex post facto* violation to subject him to sentencing pursuant to Senate Bill 1013." However, the state argued that dismissal of the aggravated murder charge was not the appropriate remedy. Rather, the state argued, "[t]he remedy is to proceed with sentencing pursuant to the prior version of [ORS 163.150(1)(b)], the statute in effect at the time the defendant committed Aggravated Murder."

The trial court ruled for defendant and dismissed the aggravated murder charge.

The state filed an interlocutory appeal pursuant to ORS 138.045(1)(a), which permits the state to appeal from "[a]n order made prior to trial dismissing or setting aside one or more counts in the accusatory instrument." Because this is a murder case, the appeal came directly to this court. ORS 138.045(2).

The state's opening brief addresses the *ex post facto* argument that defendant made in his motion for reconsideration. As in the trial court, the state does not dispute that eliminating the "continuing threat" question is an *ex post facto* violation if applied to defendant without his consent. The state argues that the appropriate remedy for the violation is for defendant to be sentenced under the law that was in effect at the time of his offense. In the alternative, the state argues that, even if this court agrees with defendant that the *ex post facto* clauses preclude defendant from being sentenced to death at all, the trial court still erred in dismissing the aggravated murder charge, because even if defendant cannot be sentenced to death, he still can be convicted of aggravated murder.

In his answering brief, defendant takes a different approach to the issue. He devotes most of his brief to an argument that, by its own terms, SB 1013 does not permit him to be prosecuted for the crime of aggravated murder. He contends that, read in context, SB 1013 does not intend the new definition of aggravated murder to apply to crimes committed before its effective date and, instead, permits those crimes to be prosecuted only as first-degree murder.

Although defendant maintains that the trial court's decision should also be sustained on *ex post facto* grounds, that issue is briefed primarily by *amicus curiae* Oregon Capital Resource Center. *Amicus* presses both of the arguments raised by defendant in the trial court: that the change to the elements of aggravated murder make application of the current definition to defendant an *ex post facto* violation and that dismissal of the charge is the appropriate remedy for the *ex post facto* violation caused by the change in the questions posed to jurors in capital sentencing proceedings.

## II.   ANALYSIS

Because the arguments in this court are different than those presented in the trial court, we find it most useful to conduct our analysis by considering each of the arguments in support of affirmance. We take up defendant's statutory argument before considering his constitutional challenges, in accordance with our ordinary "first-things-first" approach.

*State v. Algeo*, 354 Or 236, 242-43, 311 P3d 865 (2013). To provide full context for that statutory argument, we set out the content of SB 1013 in greater detail than we did above.

A.  *Statutory Background*

In Oregon, aggravated murder is punishable by "death, life imprisonment without the possibility of release or parole or life imprisonment." ORS 163.105(1)(a). Before the enactment of SB 1013, aggravated murder was defined as "murder" that is "committed under, or accompanied by," any of the statutory aggravating circumstances. ORS 163.095 (2017).[1] Those aggravating circumstances, numbering around a dozen in total, included that "[t]he victim of the intentional homicide was a person under the age of 14 years." ORS 163.095(1)(f) (2017).

SB 1013 restructured Oregon's murder statutes, limiting the circumstances in which the death penalty would be an available punishment. That restructuring took place in two steps. First, SB 1013 deleted the definitions of aggravated murder from ORS 163.095 and replaced them with five narrower definitions of aggravated murder, including, as relevant to this case, the premeditated intentional killing of a child under the age of 14. Or Laws 2019, ch 635, § 1. Second, SB 1013 created the new crime of first-degree murder, and defined that crime using all the prior definitions of aggravated murder, which had been deleted from ORS 163.095. Or Laws 2019, ch 635, § 3. For consistency, SB 1013 also renamed "murder" to "second-degree murder," without changing its definition. Or Laws 2019, ch 635, § 4.

First-degree murder, unlike aggravated murder, is not punishable by death. It is instead punishable by life without parole or life with the possibility of parole after 30 years, the two other penalties available for aggravated murder. ORS 163.107(2). As a result, first-degree murder is a less serious offense than aggravated murder, but a more serious offense than the unaggravated crime of second-degree murder defined in ORS 163.115. All conduct

---

[1] ORS 163.095 (2017) specifically referred to "murder as defined in ORS 163.115." ORS 163.115(1)(a) (2017) defined murder to include "criminal homicide" when it is committed intentionally.

that previously could be prosecuted as aggravated murder can now be prosecuted as first-degree murder, and a more limited set of conduct now constitutes aggravated murder. Thus, the intentional killing of a person under the age of 14, which previously could be prosecuted as aggravated murder, can now be prosecuted as first-degree murder. Such a killing may now be prosecuted as aggravated murder only when it is premeditated.

As mentioned, in addition to restricting the criminal conduct punishable by death, SB 1013 made changes to the questions posed to jurors in the capital sentencing process. Previously, ORS 163.150(1)(b) (2017) provided that the following four questions would be submitted to a capital sentencing jury:

"(A)   Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B)   Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C)   If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D)   Whether the defendant should receive a death sentence."

A death sentence would be imposed only if the jury unanimously answered "yes" to each of the four questions. ORS 163.150(1)(e)-(f) (2017). The state bore the burden of proving the answer to the first three questions beyond a reasonable doubt. ORS 163.150(1)(d) (2017).

Section 5 of SB 1013 eliminated the second question—the requirement that the jury find a probability that the defendant would be a "continuing threat to society." Or Laws 2019, ch 635, § 5; ORS 163.150(b)(B) (2017). As amended by SB 1013, ORS 163.150(b) now requires the jury to answer only three questions before a death sentence can be imposed. At the same time, section 5 of SB 1013 amended ORS 163.150(1)(d) to extend the "beyond a reasonable doubt"

requirement, which previously had applied only to the other questions, to the ultimate question of whether the defendant should receive a death sentence. Or Laws 2019, ch 635, § 5.

B.  *Defendant's Statutory Argument*

        Defendant's primary argument supporting affirmance of the trial court's order is that, in enacting SB 1013, the legislature did not intend to permit him to be prosecuted for the crime of aggravated murder as that crime is defined in SB 1013.

        Though defendant argues that his statutory argument was preserved, we disagree. In the trial court, defendant relied on the text of SB 1013 only in support of an argument about the appropriate remedy for the conceded *ex post facto* violation. In this court, his argument is that, entirely apart from what the constitution requires, SB 1013's new definitions of aggravated murder do not apply to him, and defendant did not raise that argument in the trial court. That failing does not, however, bar defendant's argument in this case. Because the trial court ruled in defendant's favor, he can ask us to affirm the trial court on an alternative ground, provided that the appropriate prerequisites are met. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). Here, the issue is purely one of law, and the state—which does not oppose our consideration of this issue—was not prejudiced by defendant's failure to make this argument in the trial court. It is therefore appropriate for us to consider defendant's statutory argument as a basis for affirmance.

        "The applicability of an amended statute to a pending criminal proceeding is a matter within the legislature's control, subject to *ex post facto* or other constitutional restraints." *State v. McDonnell*, 329 Or 375, 383, 987 P2d 486 (1999). "[D]etermining whether a particular statute was meant to apply prospectively or retrospectively is a matter of ascertaining the intent of the legislature." *Perkins v. Willamette Industries*, 273 Or 566, 570, 542 P2d 473 (1975). In section 30 of SB 1013, the legislature addressed that question expressly:

    "Section 3 of this 2019 Act and the amendments to ORS 40.355, 133.705, 136.450, 137.635, 137.700, 137.707, 144.079,

144.085, 144.110, 161.005, 161.405, 161.535, 163.095, 163.098, 163.103, 163.115, 163.135, 163.150, 163.707, 342.143, 419A.260, 419C.349, 419C.352, 419C.501, 421.121, 443.004 and 671.610 by sections 1 and 4 to 29 of this 2019 Act apply to crimes committed before, on or after the effective date of this 2019 Act that are the subject of sentencing proceedings occurring on or after the effective date of this 2019 Act."

Or Laws 2019, ch 635, § 30. Because section 30 specifies the cases to which SB 1013's changes apply, section 30 is the primary guide to the legislature's intent. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

We begin by observing that all the changes to existing law discussed above are listed in section 30. The offense of first-degree murder, now codified at ORS 163.107, was created by section 3 of SB 1013. The new definition of aggravated murder is found in ORS 163.095, which was amended by section 1 of SB 1013. The capital sentencing questions are found in ORS 163.150, which was amended by section 5 of SB 1013. Those amended statutes are listed in section 30 as statutes whose amendments are subject to the retroactivity provision; section 3 also is subject to the retroactivity provision even though it does not amend a statute.

Thus, current law, as changed by SB 1013, applies "to crimes committed before, on or after the effective date" of that Act—September 29, 2019—that are the subject of sentencing proceedings occurring on or after the effective date of that Act. In this case, if convicted of any crimes, defendant will be sentenced after the effective date of SB 1013. Thus, the question before us is whether defendant is charged with "crimes" that were "committed before, on or after the effective date of" SB 1013. If we consider defendant's crimes to be the acts that he allegedly committed, which were criminal when they occurred as well as under current law, the answer to that question is not a difficult one: The criminal conduct that defendant is charged with—the killing of a child under 14—was certainly committed "before, on or after" the effective date of SB 1013.

As we understand defendant's primary textual argument, he views the term "crimes" as referring not to conduct but to statutory definitions of the elements of "crimes."

Defendant contends that, in May 2019, before the effective date of SB 1013, he could not have committed the "crime" of aggravated murder, as that crime is now defined—the intentional *premeditated* killing of a child under 14—because that crime, with those defined elements, did not exist until after SB 1013 took effect. Instead, he could only have committed the "crime" of aggravated murder, as that crime was then set out—the intentional killing of a child under 14—because only that crime with those defined elements existed at that time. And, defendant contends, because that aggravated murder crime no longer exists, SB 1013 cannot be applied to charge him with aggravated murder; SB 1013 can be applied only to charge him with first-degree murder.

Thus, defendant's position is not that *none* of SB 1013's changes apply to him—if SB 1013 *did not* apply to defendant, then former ORS 163.095 would apply and he could be prosecuted for aggravated murder as that crime was defined (without the premeditation element). And defendant's position is not that *all* of SB 1013 applies to him—if SB 1013 *did* apply to him in its entirety, then he could be prosecuted for aggravated murder as that crime is now defined (with the premeditation element). Rather, defendant argues that SB 1013 should apply to prevent him from being charged with aggravated murder under the former law but not to permit him to be charged with that crime under the new one.

The problem with defendant's argument is that the retroactivity section of SB 1013, section 30, is not written to permit that mixing and matching. Under the retroactivity clause, either all of SB 1013's changes to ORS 163.095(1)(f) apply—both its deletion of the old definitions of aggravated murder *and* its addition of new definitions—or none of them do; either former ORS 163.095 applies by its terms, or amended ORS 163.095 applies by its. Section 30 does not provide a middle ground. It expressly states that *all* of the changes to ORS 163.095—including the addition of new definitions of aggravated murder—apply "to crimes committed before, on or after the effective date of this 2019 Act that are the subject of sentencing proceedings occurring on or after the effective date of this 2019 Act." In making those changes in law applicable to defendant's case, SB 1013 authorizes the

state to charge defendant with aggravated murder under current law, even though the law has changed since the crime was committed.[2]

Defendant acknowledges that that is the most straightforward reading of the text of SB 1013. Rather than providing a contrary textual analysis, defendant rests his argument primarily on a contention that it would be anomalous for the legislature to give retrospective effect to the new definitions of aggravated murder because, constitutionally, the legislature would not be able to apply its amended capital sentencing provisions to those offenses. Defendant argues that defendants who committed crimes prior to the effective date of SB 1013 could raise *ex post facto* clause objections to statutory changes that would affect their sentencings and thus would be entitled to have their sentencings proceed under prior law. A mix of new provisions at the guilt phase and old provisions at the penalty phase would, defendant posits, be so unacceptable to the legislature that it would prefer not to have individuals in that position prosecuted for capital crimes at all.

Defendant is correct that decisions about how and whether SB 1013's changes should apply to defendants who committed crimes before its enactment required practical and moral judgments by the legislature. The legislature could have balanced the various considerations in a variety of ways, including by adopting the policy for which defendant advocates. But defendant's interpretive argument has force only if we are persuaded that the legislature *did* share defendant's policy preferences. And defendant points to nothing in the bill's context or legislative history that counters its text or otherwise supports defendant's position.

---

[2] Defendant relies heavily on a hypothetical to illustrate his point, involving a bill that creates a new offense of "rocketcycling" while also reducing the penalties for other existing offenses. He contends that if that bill had a retroactivity provision worded the same way as the one at issue here, the bill's provisions prohibiting "rocketcycling" would not apply to conduct that occurred before the bill took effect, but the bill's provisions reducing the penalty for other offenses would apply to all future prosecutions, regardless of when the conduct occurred. But the hypothetical points to a different result only because of a legally significant difference. In that example, "rocketcycling" was not a crime of any sort when the conduct occurred, so, at least arguably, no "crime" was "committed" so as to trigger the retroactivity provision. Here, however, the charged conduct was a "crime" at the time that it occurred.

Defendant's argument based on comparisons between how SB 1013 operates in his case and how it would apply in other, hypothetical scenarios is no closer to the mark. Defendant contends that the comparisons that he cites show that the legislature would have preferred that he be prosecuted only for first-degree murder. Many of those arguments invite us to pass on applications of SB 1013 that are not presented here, and which may raise difficult questions of their own, questions that are not fully addressed in the briefing. We decline to resolve more than is necessary to decide this case. Section 30 of SB 1013 unambiguously makes all the changes to ORS 163.095 applicable to defendant's prosecution, and we are not free to substitute an unsupported assumption about what the legislature would have wanted to do for what it clearly did. *Monaco v. U. S. Fidelity & Guar.*, 275 Or 183, 188, 550 P2d 422 (1976) ("This court cannot correct clear and unambiguous language for the legislature so as to better serve what the court feels was, or should have been, the legislature's intent.").

For much the same reason, we reject defendant's argument that we should hold that SB 1013's new definitions of aggravated murder cannot be applied to him in order to avoid the constitutional questions that we would otherwise have to answer. Although "a court will give a statute such an interpretation as will avoid constitutional invalidity," *State v. Stoneman*, 323 Or 536, 540 n 5, 920 P2d 535 (1996), that canon is applicable only when the statute is ambiguous, and not where the "saving construction cannot be attributed to the legislature with reasonable fidelity to the legislature's words and apparent intent," *State v. Robertson*, 293 Or 402, 411, 649 P2d 569 (1982). Here, section 30 of SB 1013 expressly and unambiguously makes the substantive changes discussed above applicable to defendant's case.

C.   Ex Post Facto *Challenge to the Changed Definition of Aggravated Murder*

Having rejected defendant's statutory argument, we take up his *ex post facto* clause challenges. We begin with defendant's initial argument in the trial court, pressed on appeal by *amicus*, that, because SB 1013 altered the elements of aggravated murder, prosecuting defendant for that

crime would violate the *ex post facto* clauses of the state and federal constitutions.

As we discussed above, the charged offense occurred in May 2019. At that time, it was aggravated murder to commit "murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances," including that "[t]he victim of the intentional homicide was a person under the age of 14 years." ORS 163.095(1)(f) (2017). As amended by SB 1013, ORS 163.095 contains an analogous, but not identical, definition of aggravated murder: "Murder in the second degree, as defined in ORS 163.115, that is: * * * Premeditated and committed intentionally against a person under 14 years of age." ORS 163.095(2)(b).

That change is a limited one. The base crime—denominated "murder" under the old law and "second-degree murder" under the new law—is the same. SB 1013 did not amend the definition of murder in ORS 163.115, it simply renamed that crime "second-degree murder." *See* Or Laws 2019, ch 635, § 4. And, under both versions of the law, homicide of a child under 14 qualified as aggravated murder only if it was committed intentionally. ORS 163.095(1)(f) (2017); ORS 163.095(2)(b). Under SB 1013, however, the homicide of a child under 14 can only qualify as aggravated murder if it was premeditated. ORS 163.095(2)(b). Thus, the crime of aggravated murder now includes an additional element that the former did not: the state must prove that the homicide was premeditated.

Defendant, joined by *amicus*, argues that this change makes the current definition, as applied to him, an *ex post facto* law, prohibited by both the state and federal constitutions. We begin our analysis with the Oregon Constitution.[3]

---

[3] While in some earlier *ex post facto* cases it was "our practice" to "construe these particular state and federal provisions without distinguishing them," *State v. Wille*, 317 Or 487, 501-02, 858 P2d 128 (1993), in more recent cases "this court did not defer to the federal *ex post facto* analysis, but instead relied on the formulation established in *Priest v. Pearce*, 314 Or 411, 840 P2d 65 (1992), to ascertain the meaning of Article I, section 21," *State v. MacNab*, 334 Or 469, 474, 51 P3d 1249 (2002). Our Article I, section 21, case law has diverged in places from the Supreme Court's application of the analogous provision. Thus, it is appropriate to consider the two provisions separately.

1.   *Article I, section 21*

Article I, section 21, of the Oregon Constitution, provides that "No *ex-post facto* law \*\*\* shall ever be passed[.]" "Despite Article I, section 21's seemingly broad scope, this court has restricted that provision's prohibition to criminal laws, and, further, to only certain kinds of criminal laws[.]" *State v. Cookman*, 324 Or 19, 26, 920 P2d 1086 (1996) (internal citation omitted). We have stated that, "[g]enerally speaking, *ex post facto* laws punish acts that were legal at the time they occurred, change the punishment for those acts, or deprive the defendant of a defense for those acts." *State v. Gallant*, 307 Or 152, 155, 764 P2d 920 (1988).

This court's most substantial discussion of the meaning of the *ex post facto* clause came in *Cookman*. In that decision, we addressed the materials that would have informed the understanding of *ex post facto* laws when the Oregon Constitution was ratified. We paid particular attention to the explanation given by Justice Chase in the case of *Calder v. Bull*, 3 US 386, 1 L Ed 648 (1798):

> "'I will state what laws I consider *ex post facto* laws, within the words and the intent of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive. \*\*\* The celebrated and judicious Sir William Blackstone, in his commentaries, considers an *ex post facto* law precisely in the same light as I have done. His opinion is confirmed by his successor, Mr. Wooddeson; and by the author of the *Federalist*, who I esteem superior to both, for his extensive and accurate knowledge of the true principles of government.'"

*Cookman*, 324 Or at 30-31 (quoting *Calder*, 3 US at 390-91 (*seriatim* opinion; alteration in *Cookman*)). We stated in *Cookman* that,

"[w]hatever the merits of Justice Chase's formulation with regard to the federal constitution, as with Blackstone's *Commentaries* and *The Federalist*, Chase's opinion was available to the framers of the Oregon Constitution. Perhaps more importantly, it also was cited by the Indiana Supreme Court in *Strong* [*v. The State*, 1 Blackf 193, 196 (Ind 1822)], a decision that was available to the framers of the Oregon Constitution when they decided to adopt the Indiana *ex post facto* provision in our state constitution."

324 Or at 31. In *Cookman*, relying in part on *Calder*, we summarized the general scope of the guarantee against *ex post facto* laws as prohibiting: "(1) laws that punish acts that were legal before the enactment of those laws; (2) laws that impose greater or additional punishment than that available before the enactments of those laws; and (3) laws that deprive the defendant of a defense." *Id*. That formulation omitted the fourth *Calder* category, but in *State v. Fugate*, 332 Or 195, 214, 26 P3d 802 (2001), we concluded that "all four categories identified in *Calder* are applicable in applying Article I, section 21," holding that the *ex post facto* laws clause barred one-sided retroactive changes to the laws of evidence.

The change at issue here—the addition of a requirement that the state prove that the murder was premeditated in order to obtain a conviction for aggravated murder on the charged theory—does not fall into any of those traditional prohibitions. First, the conduct that defendant is charged with, the premeditated, intentional murder of a child under the age of 14, was not legal in May 2019, when the offense is alleged to have occurred. That conduct, whether premeditated or not, violated ORS 163.095(1)(f) (2017), which at the time applied to any intentional murder of a child under 14. Any defendant who committed aggravated murder as now defined by ORS 163.095(2)(b) necessarily committed aggravated murder as previously defined by ORS 163.095(1)(f) (2017).

Second, SB 1013's change to the definition of aggravated murder did not subject defendant to any greater punishment. In May 2019, before the enactment of SB 1013, the intentional murder of a child under the age of 14 was punishable by life with the possibility of parole after

30 years, life without parole, or death. Defendant faces those same penalties should he be convicted of aggravated murder under the changed definition.

Third, requiring the state to prove the additional element of premeditation did not *deny* defendant any defense that was available to him in May 2019. To the contrary, by adding an element that the state must prove, SB 1013 effectively *gave* defendant an additional defense—that the state must and cannot prove that the homicide was premeditated. And, fourth, adding the element of premeditation did not alter the rules of evidence applicable to defendant's case.

*Amicus* does not dispute that the change at issue here—the addition of an element—does not fall within the *Calder* formulation. *Amicus* argues instead that the *Calder* categories are not exclusive, and that a law may violate the *ex post facto* clause even if it does not fall within those categories. More specifically, *amicus* contends that we already have held that any change to a crime's elements is an *ex post facto* law that cannot constitutionally be applied to a defendant who acted before the change was effective.

The state responds by arguing that adding a new element to an existing offense cannot be an *ex post facto* violation because the change is, from defendant's perspective, ameliorative. Because the change does not disadvantage defendant in any way, the state posits, the *ex post facto* laws clause does not prevent the change from being applied to defendant.

We have recognized before that

> "the categories described in *Calder* are general ones, used to summarize the types of *ex post facto* laws that the federal constitutional provision then prohibited. Justice Chase made that clear in his opinion by stating that the laws described in those categories and '[a]*ll* \*\*\* *similar laws* are manifestly unjust and oppressive.'"

*State v. Guzek*, 336 Or 424, 435, 86 P3d 1106 (2004), *vac'd and rem'd*, 546 US 517, 126 S Ct 1226, 163 L Ed 2d 1112 (2006), *and modified*, 342 Or 345, 153 P3d 101 (2007) (quoting *Calder*, 3 US at 390-91 (emphasis in *Guzek*)). The *Calder* formulation is a guide to the proper interpretation of the *ex post facto* clause, but not necessarily an exhaustive one.

We have consistently held, however, that not every change in the law, applied retroactively, is an *ex post facto* law within the meaning of the constitutional provision. *Cookman*, 324 Or at 26. At minimum, to constitute an *ex post facto* law, the change must be one that disadvantages defendants. That principle, which is supported both by the *Calder* formulation and by the rationale underpinning Article I, section 21, was affirmed by this court in *State v. Upton*, 339 Or 673, 125 P3d 713 (2005).

The *ex post facto* challenge at issue in *Upton* arose after the legislature made changes to Oregon sentencing procedures in order to bring them into compliance with *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004). When the defendant had committed his offense, sentencing enhancement factors had to be proven to the court by a preponderance of evidence. SB 528 (2005) changed that process by requiring the state to prove certain facts to a jury beyond a reasonable doubt, "unless a defendant waives a jury determination of that fact." *Upton*, 339 Or at 677.

This court approached the question of whether the retroactive application of those changes violated Article I, section 21, by examining the effect of the changes to determine whether they were detrimental to defendants. We noted that the change of factfinder was not detrimental to defendants because "criminal defendants may choose, as they see fit, either a jury or the court to serve as the factfinder for the purpose of determining aggravating factors at sentencing." *Id.* at 683. We also rejected the defendant's argument that SB 528 violates the *ex post facto* clause because it permits the introduction of additional, prejudicial evidence. We again reasoned that the new law was not detrimental to the defendant, saying that "SB 528 permits bifurcation of the penalty phase from the guilt phase to avoid presenting prejudicial evidence to the jury when it determines guilt." *Id.* at 683. Finally, and most explicitly, we noted that,

> "[t]o the extent that SB 528 changes the quantum of proof required under the sentencing guidelines, it inures to defendant's advantage to require the state to prove any enhancing factors beyond a reasonable doubt. *For a statute*

*to violate state or federal* ex post facto *clauses, the statute must at least effect some kind of disadvantageous change upon a defendant.*"

*Upton*, 339 Or at 683 (emphasis added).

The principle that a change must be adverse to criminal defendants to constitute an *ex post facto* law is consonant with the traditional categories of *ex post facto* laws that we have recognized—all of which involve changes harmful to defendants. Neither defendant nor *amicus* advances any argument for why the *ex post facto* laws clause *should* bar the legislature from making retroactive changes beneficial to criminal defendants or points to historical evidence that additions to the state's burden of proof were viewed as *ex post facto* laws;[4] such changes are hardly the "manifestly unjust and oppressive" laws that the *ex post facto* clause was adopted to bar. *Calder*, 3 US at 390-91. Here, no argument is made that the addition of a requirement that the state prove that defendant's conduct was premeditated is detrimental to him, or to any other defendant.[5]

*Amicus* does not quarrel with that conclusion, but, relying on a single quotation from *State v. Wille*, 317 Or

---

[4] *Amicus* points to certain recent Indiana decisions, which it argues support its position. *Tyson v. State*, 51 NE3d 88 (Ind 2016); *Stroud v. State*, 809 NE2d 274 (Ind 2004); *Abernathy v. Gulden*, 46 NE3d 489 (Ind Ct App 2015); *Minton v. State*, 802 NE2d 929 (Ind Ct App 2004). In *Cookman*, recognizing that the Indiana constitution was the basis for Article I, section 21, we surveyed the Indiana *ex post facto* decisions that would have informed the understanding of ratifiers in Oregon, though we found it "readily obvious that those Indiana decisions do not add much to this court's previously announced understanding of Article I, section 21." 324 Or at 29. Moreover, even if more recent Indiana decisions had any special probative value, none of the cited cases recognize an *ex post facto* clause violation in the absence of harm to defendants.

[5] In some circumstances, addition of an element, while formally increasing the state's burden of proof, could be disadvantageous to a defendant by opening the door to the introduction of prejudicial evidence that otherwise would be irrelevant. The defendant made an argument along those lines in *Upton*, 339 Or at 682-83, though there we held that the bifurcation of guilt and penalty phases in enhancement factor sentencing negated that possibility, and so we did not need to decide whether such a change would violate the *ex post facto* clause. We do not need to decide that question here, either. Neither defendant nor *amicus* advances such an argument. That choice is understandable, because it is difficult to conceive of any evidence relevant to the element of premeditation that would not already be relevant to the element of intent or to proving that the defendant committed the murder. The addition of the requirement that the state prove premeditation increases the state's burden of proof without opening the door to the introduction of previously irrelevant and prejudicial testimony.

487, 502, 858 P2d 128 (1993), insists that we already have held that *any* change to the elements of a crime violates the *ex post facto* clause. In making that argument, however, *amicus* takes its quote out of context. In summarizing the *ex post facto* principles that we would apply, we quoted first our general statement in *Gallant* that, "'*ex post facto* laws punish acts that were legal at the time they occurred, [increase] the punishment for [criminal] acts, or deprive the defendant of a defense for those acts.'" *Wille*, 317 Or at 502 (quoting *Gallant*, 307 Or at 155 (alterations in *Wille*)). We then quoted portions of the Supreme Court's recent decision in *Collins v. Youngblood*, 497 US 37, 110 S Ct 2715, 111 L Ed 2d 30 (1990), including the Court's summary that, under the federal *ex post facto* clause, "'[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *Wille*, 317 Or at 502 (quoting *Collins*, 497 US at 42 (alteration in *Wille*)). But *Collins*, far from holding that *any* change to a crime's elements was an *ex post facto* violation, expressly stated that "the constitutional prohibition on *ex post facto* laws applies only to penal statutes which *disadvantage* the offender affected by them." *Collins*, 497 US at 41. (Emphasis added.) Our passing quotation of an ambiguous line from *Collins* can hardly be read as a holding to the contrary.

  2.  Ex Post Facto *Clause of the United States Constitution*

Defendant's argument under the federal *ex post facto* clause fails for the same reason. The Supreme Court has held that "[i]t is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law." *Dobbert v. Florida*, 432 US 282, 294, 97 S Ct 2290, 53 L Ed 2d 344 (1977); *see also Collins*, 497 US at 41 ("Although the Latin phrase '*ex post facto*' literally encompasses any law passed 'after the fact,' it has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them."). Moreover, the Court has made clear that the scope of the federal *ex post facto* clause is limited to the specific categories recognized by the *Calder* formulation, which does not encompass changes that narrow a statute's elements. *Collins*, 497 US at 42-43; *Carmell v. Texas*, 529

US 513, 525, 120 S Ct 1620, 146 L Ed 2d 577 (2000). The addition of a premeditation element is not an *ex post facto* law within the meaning of the federal constitution.

D.    Ex Post Facto *Challenge to Penalty-Phase Changes*

We now turn to the basis for the trial court's ruling: SB 1013's change to penalty-phase procedures in capital sentencing by eliminating the "continuing threat" question posed to the jury. As discussed above, the trial court concluded that, because that change was an *ex post facto* law, defendant could not be sentenced to death, and the court was required to dismiss the aggravated murder charge against defendant.

The issue before this court is somewhat more limited. The state conceded in the trial court that the elimination of the continuing threat question was an *ex post facto* law. On appeal, the state, as appellant, has not challenged the trial court's determination of that issue, and the parties have not meaningfully briefed that question. In the posture of this appeal, therefore, we assume that the challenged portion of SB 1013 cannot constitutionally be applied to defendant over his objection and decide whether the consequence of that determination is, as the trial court concluded, that the state cannot seek the death penalty.

1.    *Article I, section 21*

We begin with the *Ex Post Facto* Clause of the Oregon Constitution. The state argues that the appropriate remedy for *ex post facto* clause violations under the state constitution "is to apply the law in place at the time the offense occurred." The state argues that that approach would be consistent with two prior decisions of this court, *State v. Langley*, 318 Or 28, 31-32, 861 P2d 1012 (1993), and *Guzek*, 336 Or at 438. The state also argues that defendant retains the option of waiving his *ex post facto* rights and being sentenced under SB 1013.

Defendant makes no independent argument in support of the trial court's reasoning, relying entirely on the arguments made by *amicus*. *Amicus*, although apparently not disputing the state's contention that the ordinary

remedy for an *ex post facto* law is to apply the law that was in place at the time that the offense was committed, advances two arguments that that course would be inappropriate here. First, *amicus* argues that the unamended penalty phase statutes were unconstitutional, so the state's remedy would leave defendant to choose between two unconstitutional alternatives. Second, *amicus* argues that a severability analysis is appropriate, and the solution is to sever the portions of the statute that permit "the State to charge a defendant with aggravated murder for acts committed prior to the statute's creation[.]"

We agree with the state that the appropriate course, when a defendant successfully challenges the application of a change in the law on *ex post facto* grounds, is that the prosecution should proceed under the law as it was at the time of the offense. We have confronted analogous questions before, beginning with *Wille*, 317 Or at 505.

In *Wille*, we considered the effect of a statute that had expanded the sentencing options for aggravated murder to include not only the death penalty or life *with* the possibility of parole, but also the possibility of life *without* the possibility of parole. *Id.* at 504. We held that that statute was unconstitutional when applied to defendants found guilty of crimes occurring before its enactment. Specifically, we concluded that "[r]etroactive imposition of that punishment violated Article I, section 21, of the Oregon Constitution, and Article I, section 10, of the Constitution of the United States." *Id* at 505. In *Wille*, the jury had done just that; it had not imposed the death penalty but had sentenced the defendant to life *without* parole. *Id.* at 489. We determined that the appropriate remedy, in that posture, was to remand for imposition of a sentence of life *with* the possibility of parole, the only remaining permissible sentence. *Id.* at 505.

Our disposition in *Wille* is consistent with the state's position that, in fashioning a remedy for an *ex post facto* violation, we look to the law in existence at the time the crime was committed. And it is inconsistent with the position, advanced by defendant in the trial court, that an *ex post facto* change to penalty phase proceedings precludes

prosecution of an aggravated murder charge at all. But the remedy in *Wille* was shaped by the particular posture of that case, including the sentencing determination that the jury had already made, so it does not completely answer the question posed here.

A second case, *State v. Langley*, 314 Or 247, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993), is more directly on point. In our initial decision in that case, which was issued before *Wille*, we affirmed the defendant's aggravated murder convictions, but we reversed his death sentence because of an error in jury instructions and remanded for resentencing. *Id.* at 272. Because the defendant also had raised arguments relating to the true-life sentencing option, we stated in a footnote that

> "[w]e need not address defendant's arguments because the 'life without parole' option was added to the statutory scheme in 1989; in any new penalty phase proceeding, defendant will be sentenced under the statutory scheme in force in 1987 or 1988, when the crime was committed."

*Langley*, 314 Or at 254 n 5. The state petitioned for reconsideration, challenging that aspect of our disposition. In our opinion on reconsideration, we provided further elaboration by citing to our opinion in *Wille*, which had been issued between our initial opinion and our opinion on reconsideration:

> "Pursuant to *Wille*, defendant constitutionally could not have been sentenced under the life imprisonment without possibility of parole sentencing option, and the trial court incorrectly instructed the jury on that option. Therefore, footnote 5 of *State v. Langley* correctly states that defendant must be sentenced on remand under the sentencing provisions in force at the time that the murder was committed."

*Langley*, 318 Or at 31-32. Thus, in *Langley*, we decided that it was unconstitutional to apply a change in the law to the defendant's case and that the appropriate remedy was to apply the law in effect at the time of the offense.

In *State v. Guzek*, 336 Or at 438, we followed the same path. The *ex post facto* question in that case involved a change to a statutory fourth question asked in capital

sentencing proceedings—whether the defendant should be put to death. In answering that question, defendants had been permitted "to introduce general mitigating evidence that militated against imposition of the death penalty." *Guzek*, 336 Or at 433. However, the penalty phase statutes were amended to also permit "admission of 'any aggravating evidence' under the fourth question." *Id*. We held that that change violated the *ex post facto* clause when applied to defendants who had committed their crimes before the change. *Id*. at 438. We therefore held that, on remand,

> "[t]he trial court is precluded from retroactively applying the 'any aggravating evidence' provisions of the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B). Any determination of the relevance of the state's aggravating evidence against defendant therefore must be in relation to the first three statutory questions set out in ORS 163.150 (1)(b)(A) to (C) or in relation to rebuttal of any particular mitigating evidence offered by defendant."

*Id*. at 438-39.

 *Langley* and *Guzek* establish that, when the legislature makes an unconstitutional retroactive change to capital sentencing procedures, Article I, section 21, does not preclude the defendant from facing capital sentencing proceedings altogether. Rather, it precludes only the change in the law from being applied retroactively to the defendant's case without the defendant's consent. Following that rubric, then, the *ex post facto* clause, when invoked, would preclude SB 1013's elimination of the continuing threat question from being applied, retroactively, in defendant's case. In other words, Article I, section 21, invalidates the legislature's statutory directive, in section 30 of SB 1013, that that application occur in defendant's case.

 *Amicus* does not agree, relying on principles of severability. Citing ORS 174.040, *amicus* argues that we should "remov[e] the provision from the effective date clause that allows the State to charge a defendant with aggravated murder for acts committed prior to the statute's creation." *Amicus* contends that this would lead to more consistent treatment of defendants who committed capital offenses before the enactment of SB 1013.

But that severability statute is not a license to rewrite SB 1013. ORS 174.040 provides that

"it is the legislative intent, in the enactment of any statute, that if any part of the statute is held unconstitutional, the remaining parts shall remain in force unless:

"(1)   The statute provides otherwise;

"(2)   The remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the remaining parts would not have been enacted without the unconstitutional part; or

"(3)   The remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the legislative intent."

Here, the portion of SB 1013 that, in the posture of this case, we assume to be unconstitutional is the retroactive elimination of the continuing threat question. Neither *amicus* nor defendant argues that any other part of SB 1013 is "so essentially and inseparably connected with and dependent upon the unconstitutional part," ORS 174.040(2), that a broader portion of the statute must be held inapplicable to defendant as well.[6]

In addition, *amicus* asserts that the capital sentencing procedures in place at the time of defendant's crime were constitutionally defective and that defendant cannot be forced to choose between an unconstitutional sentencing procedure and an *ex post facto* law. *Amicus* cites legislative history that it argues evidences a concern about the constitutionality of the third question, but neither *amicus* nor defendant advances a substantive argument to persuade us that we must conclude that the death penalty procedures in place before SB 1013 were unconstitutional. In any event,

---

[6] The state takes the position that SB 1013's change to the fourth capital sentencing question can be applied to "any capital sentencing proceeding in defendant's case" without raising *ex post facto* concerns, and defendant does not appear to disagree. Neither party argues that that change is not severable. In any event, the question before us is whether the trial court erred in dismissing the aggravated murder charge and, though our reasoning may have additional implications for sentencing procedures in defendant's case should he assert his *ex post facto* rights, other questions that may be relevant to sentencing are not before us at this time.

the question before this court is whether SB 1013's changes to the death penalty preclude the state from charging defendant with aggravated murder and seeking the death penalty. Our resolution of that question does not preclude defendant from raising different constitutional challenges to the death penalty in the trial court, but those questions are not before us at this time.

2. Ex Post Facto *Clause of the United States Constitution*

Under the federal constitution, we reach the same conclusion. Assuming that SB 1013's elimination of the "continuing threat" question violates the *Ex Post Facto* Clause of the United States Constitution, the United States Supreme Court has outlined the appropriate remedy for such a violation in the same manner that this court has under Article I, section 21:

> "The proper relief upon a conclusion that a state prisoner is being treated under an *ex post facto* law is to remand to permit the state court to apply, if possible, the law in place when his crime occurred. In remanding for this relief, we note that only the *ex post facto* portion of the new law is void as to petitioner, and therefore any severable provisions which are not *ex post facto* may still be applied to him."

*Weaver v. Graham*, 450 US 24, 36 n 22, 101 S Ct 960, 67 L Ed 2d 17 (1981) (citations omitted). Under that rule, the *ex post facto* change in the law cannot be applied to defendant, but he can be prosecuted for aggravated murder and the state is entitled to seek the death penalty.

## III. CONCLUSION

For the reasons that we have given, we conclude that the trial court erred in dismissing the charge of aggravated murder. We therefore reverse that order and remand the case to the trial court for further proceedings.

The order of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.